UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO.: 00-6172-CIV-ZLOCH

PSS INTERNET SERVICES, INC.,
a Florida corporation and
GEORGE KUHN, individually,

        Plaintiffs,

v.

JEREMY GREENIDGE, individually,
AMERICA DOT COM, INC., a
Tortola, British Virgin Islands
Corporation and GREATDOMAINS.COM,
INC., a California corporation,

        Defendants.

_____/



## NOTICE OF FILING

Defendants, America Dot Com, Inc., and Jeremy Greenidge, by and through

undersigned counsel, hereby give notice of filing the deposition transcript of George

Kuhn, in support of their Motion for Summary Judgement and Incorporated

Memorandum of Law.

        BUCHANAN INGERSOLL, P.C.
        Attorneys for America Dot Com
        and Jeremy Greenidge
        2100 Bank of America Tower
        100 Southeast Second Street
        Miami, Florida 33131
        (305) 347-4080 Fax: 347-4089

        WILLIAM E. DAVIS, ESQ.
        Florida Bar No.: 191680
        JILL A. COOK-EDWARDS, ESQ.
        Florida Bar No.: 0115411

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY, that a true copy of the foregoing was mailed this 7

day of March, 2001 to: John C. Rayson, Esq., Law Offices of John C. Rayson, Second

Floor, 2400 East Oakland Park Boulevard, Fort Lauderdale, FL 33306.

JILL A. COOK-EDWARDS

2

1

1          UNITED STATES DISTRICT COURT
           SOUTHERN DISTRICT OF FLORIDA
2
           CASE NO. 00-6172-CIV-ZLOCH
3

4     PSS INTERNET SERVICES, INC., a Florida croporation and
      GEORGE KUHN, individually,
5

6
                                        COPY
7               Plaintiffs,
      Vs.
8

9     JEREMY GREENIDGE, individually, AMERICA DOT COM, INC.,
      a Tortola, British Virgin Islands Corporation and
10    GREATDOMAINS.COM, INC., a California corporation,

11

12
                    Defendants.
13    _____

14
                         100 SE 2nd Street
15                       Miami, Florida
                         Wednesday, February 28 , 2001
16                       1:30 P.M.

17

18                  DEPOSITION OF GEORGE KUHN

19

20               Taken before PAUL C. LEVERITT, Notary

21    Public in and for the State of Florida at Large,

22    pursuant to Notice of Taking Deposition filed in the

23    above cause.

24

25

```
 1                    A-P-P-E-A-R-E-N-C-E-S

 2

 3            THOMAS MOSS, Esq.
              of the law office of John C. Rayson
 4            On behalf of the Plaintiffs

 5            WILLIAM E. DAVIS, Esq.
              JILL A. COOK-EDWARDS, Esq.
 6            of the firm of Buchanan Ingersoll, P.C.
              On behalf of the Defendants
 7

 8

 9

10

11

12

13                        I-N-D-E-X
                                            RE-     RE-
14   WITNESS            DIRECT   CROSS    DIRECT   CROSS

15   GEORGE KUHN

16   BY MR. DAVIS ............ 3
     BY MR. MOSS ................... 88
17   BY MR. DAVIS ........................... 90

18
                        E-X-H-I-B-I-T-S
19
                                       PAGE     LINE
20
     DEFENDANT'S EXHIBIT 1 FOR ID ............ 19       4
21   DEFENDANT'S EXHIBIT 2 FOR ID ............ 57       2
     DEFENDANT'S EXHIBIT 3 FOR ID ............ 66       4
22   DEFENDANT'S COMPOSITE EXHIBIT 4 FOR
         ID ................................. 71      20
23   DEFENDANT'S EXHIBIT 5 FOR ID ............ 74       2
     DEFENDANT'S EXHIBIT 6 FOR ID ............ 77      18
24

25
```

```
 1   THEREUPON --
 2                        GEORGE KUHN
 3   was called as a witness and, after having been first
 4   duly sworn, was examined and testified as follows:
 5                      -  -  -  -  -
 6                    DIRECT EXAMINATION
 7   BY MR. DAVIS:
 8       Q.    Would you state your complete name and
 9   residence address.
10       A.    George Thomas Kuhn, 105 Lake Emerald Drive,
11   apartment 804, Oakland Park, Florida 33309.
12       Q.    How long have you resided at that address?
13       A.    August of 1984.
14       Q.    Any plans to move in the near future?
15       A.    No.
16       Q.    Do you maintain a business address?
17       A.    I have a business address for my
18   S-corporation corporation.  It's South Florida
19   Aerodyne, Incorporated, 4631 Northwest 31st Avenue,
20   number 126, Fort Lauderdale, Florida 33309.
21       Q.    What's the nature of that business?
22       A.    Historically it has been aircraft leasing.
23   It's kind of dormant right now.  I don't own any
24   airplanes any more but the corporation is still alive.
25       Q.    Is that an address that you go to from time
```

4

```
 1   to time?
 2       A.    Yes.   It's a MailBoxes, Etc., mail box.
 3   That's all it is.
 4       Q.    Mr. Kuhn, have you had your deposition
 5   taken before?
 6       A.    No.
 7       Q.    Let me go through some ground rules here so
 8   we can understand one another.
 9             I will be asking you a lot of questions
10   today about this case and if for any reason you don't
11   understand the question, because I'm not perfect in
12   the way I ask questions, feel free to tell me to
13   rephrase it or tell me that you don't understand it.
14             If you answer a question I'm going to
15   assume that you understood it; okay?
16       A.    Okay.
17       Q.    Another thing is I am going to have to ask
18   you to answer affirmatively.  Nods of the head become
19   ambiguous with the court reporter, so when I ask you a
20   question, just answer out loud.
21       A.    Okay.  I'll try to remember that one.
22       Q.    Could you give me a description of your
23   educational background, please?
24       A.    I guess my highest level of education is a
25   bachelor's degree, it's a Bachelor's of Science in
```

1    Aeronautics from Park College of St. Louis University,

2    St. Louis, Missouri.

3         Q.    When did you achieve that?

4         A.    December 1973.

5         Q.    Have you had any other post graduate

6    educational course work?

7         A.    Nothing beyond the bachelor's degree.

8         Q.    Could you give me a description of your

9    employment history since achieving your degree?

10        A.    Right out of college I worked as an

11   aerospace engineer for the Navy at the Norfolk Naval

12   Air Station in Norfolk, Virginia.  Then I went --

13        Q.    How long did you do that?

14        A.    Six months.

15        Q.    Then what?

16        A.    Then I went into the Air Force, active duty

17   for Air Force pilot training and I did that from June

18   of '74 and I stayed active duty until April of '77.

19        Q.    As a pilot?

20        A.    As a pilot, an Air Force pilot.

21        Q.    What did you fly?

22        A.    KC 135 is the airplane I ended up with

23   after pilot training.

24        Q.    Thereafter did you then leave the service?

25        A.    I went into the reserves, actually Air

6

1   National Guard in Milwaukee, Wisconsin.  Continued to
2   fly the KC 135.
3        Q.   Were you full-time in the Guard?
4        A.   No, I was not.
5             I kind of bummed around for the most part
6   for a couple of years.  I worked for a short time for
7   Morton Salt as a pilot mechanic somewhere outside
8   Chicago, I forget the name of the town that they were
9   in.
10            Then I got a job as a flight instructor
11  with Rayvon Aviation, Inc. in Naperville, Illinois.
12       Q.   What do you do for them?
13       A.   Flight instructor.  Then I went on to fly
14  what we called FAR 145, which is F-A-R, which we
15  operate as a small airline.  It started while I was
16  there.
17       Q.   Give me some idea of the time, dates and
18  chronological dates?
19       A.   This would just be estimates.  Probably
20  about January of '78 Morton Salt.  That lasted
21  probably for about four months, and then Rayvon
22  Aviation, somewhere around May or June of '78.  I
23  stayed with them until June of '79.  I went to work
24  for Coleman Air Transport in Rockford, Illinois.
25       Q.   As a pilot?

1          A.    As a pilot, flying scheduled and on-demand
2    charters.
3              Then in October of 1979 I got hired by
4    Piedmont Airlines as a pilot.  They were in
5    Winston-Salem, North Carolina.
6          Q.    How long did you work for Piedmont?
7          A.    Well, I'm still there.  Piedmont was
8    eventually bought out by U. S. Air in 1987 and the job
9    went with it, so I have been basically with this
10   company since October of '79.  That's where I am
11   today.
12         Q.    Currently with U. S. Airways?
13         A.    Yes.
14         Q.    As a pilot?
15         A.    Yes.
16         Q.    Do you fly for U. S. Airways on a regular
17   base?
18         A.    Yes.  Full-time.
19         Q.    When did you first meet Jeremy Greenidge?
20         A.    I think I met Jeremy through mutual friends
21   around 1989 but that's just a really rough estimate.
22         Q.    Do you recall the circumstances of the
23   first meeting?
24         A.    I think it was probably a party, a
25   gathering in Daytona Beach.  I have several friends

8

1   that went to school there and they were friends of

2   Jeremy.  I probably met him at a party but I don't

3   recall if that's truly the case but that would seem

4   the most likely case that I know of that I met him.

5        Q.    Did you have any business dealings with

6   Mr. Greenidge at any time prior to this PSS Internet

7   investment?

8        A.    None.

9        Q.    Do you recall the names of the individuals

10  that introduced you to Mr. Greenidge?

11       A.    It had to be Harold Millan.

12       Q.    Well, he was next on my list.

13       A.    Yeah.

14       Q.    When did you first meet Harold Millan?

15       A.    Also I met Harold through mutual friends,

16  Daytona Beach, probably also, probably around 1989.

17       Q.    Do you recall the names of any of the

18  mutual friends that would have introduced you to

19  Mr. Millan and Mr. Greenidge?

20       A.    Yes.  He was a former flight student of

21  mine.  His name was J. P. Farmer.

22       Q.    Is he located in Daytona Beach?

23       A.    Now?

24       Q.    Was he then?

25       A.    He was.  They were all students at Embry

9

```
 1   Riddle University.
 2        Q.   At that time?
 3        A.   At that time, yeah.
 4        Q.   Jeremy Greenidge was, too?
 5        A.   To my knowledge he was.  I believe he was
 6   in a master's degree program, I think.
 7        Q.   How about Charles Henderson?  When was the
 8   first time you met him?
 9        A.   He came in to PSS kind of late in the game,
10   as I recall.  I only met him maybe once or twice.  For
11   a very short time.
12        Q.   So is it fair to say that you didn't meet
13   him at any time prior to him coming into PSS Internet?
14        A.   No, I don't believe I did.  In fact, I
15   think he was already an investor when I met him.
16        Q.   Have you had any business dealings with
17   Harold Millan other than the PSS Internet transaction?
18        A.   No.
19        Q.   Now, between 1989 and I think you indicated
20   sometime in 1995, correct, in PSS Internet --
21        A.   I think it was '94.  I think it was October
22   of '94.
23        Q.   We will use that as a --
24        A.   Yes.
25        Q.   How frequently would you have had occasion
```

1    to see Jeremy Greenidge between 1989 and 1994?

2        A.    Since my friends like Harold Millan and J.

3    P. Farmer went on to graduate shortly after the 1989

4    time frame, I really had no occasion to go back up to

5    Daytona Beach so I probably didn't see Jeremy again

6    until I actually went to Daytona to make the

7    investment in this, in this venture, PSS.

8        Q.    Did you have any contact with him at all?

9        A.    No.

10       Q.    Telephone correspondence or anything of

11   that nature?

12       A.    Nothing.  Nothing that formal.  Jeremy at

13   best is an acquaintance.

14       Q.    I was going to ask you how would you

15   describe your relationship with him prior to your

16   investment in PSS Internet?

17       A.    As an acquaintance at best.  If I saw him

18   on the street I would know who he was but and I would

19   say hey, hello, but nothing beyond that.  Maybe

20   discuss the weather.

21       Q.    How about Harold Millan?  How frequently

22   would you have seen him between 1989 and 1994?

23       A.    I saw Harry a lot.  Harry has always been

24   fairly close to me.

25       Q.    How would you describe your relationship

11

1   with Mr. Millan?

2       A.    I guess about as close as friends can be

3   without being brothers.  I would say he's -- I had

4   always considered him almost a brother to me.

5       Q.    Did you socialize with him?

6       A.    Yes.

7       Q.    Since 1994 have you continued to socialize

8   with Mr. Millan?

9       A.    Yes.

10      Q.    When was the last time you saw him?

11      A.    Probably about six or seven months ago.

12  Harry works for U. S. Airways, too, now as a pilot so

13  the last time I saw him was in the crew.  He was based

14  in Philadelphia where I am, so --

15      Q.    Before investing in PSS Internet, did you

16  have any investment experience in investing in

17  internet service providers?

18      A.    No.

19      Q.    Did you have any experience in acquiring or

20  registering domain names?

21      A.    No.

22      Q.    Have you ever personally registered a

23  domain name?

24      A.    Yes.

25      Q.    When did you do that for the first time?

                                                              12

1        A.      I think about a year ago.  Maybe a little
2    more.
3        Q.      Have you registered more than one?
4        A.      Two.
5        Q.      What are the names?
6        A.      Aeronaut Dot Net and --
7        Q.      A-e-r-o --
8        A.      A-e-r-o-n-a-u-t Dot Net and I'll spell the
9    next one, C-i-n-e-g-r-f-i-x Dot Com.
10       Q.      Did you register those in your personal
11   name?
12       A.      Yes.
13       Q.      With Network Solutions?
14       A.      Yes, I believe it was.
15       Q.      Were there fees associated with registering
16   those domain names?
17       A.      Yes.
18       Q.      Did you pay them?
19       A.      Yes.
20       Q.      What were the fees?
21       A.      I think it was $70 for two years.
22       Q.      Are there any other fees associated with
23   the maintenance of the domain names, to your
24   knowledge?
25       A.      Just the renewal when it comes up for

13

1   expiration.

2       Q.    How did you first become aware of the

3   existence of PSS Internet Services, Inc.?

4       A.    From Harold Millan.

5       Q.    When was that?

6       A.    Probably just within the month before I had

7   actually invested, so that would make it maybe

8   September, early October of '94.

9       Q.    Under what circumstances, what were the

10  circumstances surrounding Mr. Millan making you aware

11  of PSS Internet?

12      A.    He just came to me, told me that he had

13  gone in on this venture with Jeremy and, you know,

14  maybe I would be interested.

15      Q.    What did he tell you about it?

16      A.    He told me it was an internet service

17  provider.

18      Q.    Did you have an understanding of what that

19  meant?

20      A.    Yes.  At that time the internet was, had

21  already started to catch fire, so I knew what the

22  internet was.

23      Q.    What did you understand that PSS Internet

24  was doing as an internet service provider at that

25  time?

14

1      A.    That they would be providing dial up

2   connection for individual subscribers to access the

3   internet.

4      Q.    Did Mr. Millan tell you anything about the

5   structure of the company, who the shareholders were,

6   who the officers were, things of that nature?

7      A.    Yeah.  Well, he told me it was, at that

8   point it was just Jeremy and himself.  They were

9   looking for another investor because I guess at that

10   point they needed cash.

11      Q.    To your best recollection, when was this?

12      A.    To my best recollection it would be October

13   of '94.  I would, I would actually probably have to go

14   back and look at my canceled checks to see if I have

15   that right or not.

16      Q.    When did you actually invest as opposed to

17   becoming aware of the company?

18      A.    To the best of my recollection, October of

19   '94.

20      Q.    So was the actual time that you made the

21   investment almost contemporaneous with the time that

22   Mr. Millan came and told you about it?

23      A.    It was very shortly thereafter.  Sounded

24   like an exciting proposal.

25      Q.    What sounded exciting about it to you?

1       A.    Cutting edge.  Like I said, the internet

2   was just starting to catch fire and I thought it would

3   be nice to invest in something that, at the leading

4   edge of the boom rather than at the bust.

5       Q.    Did Mr. Millan give you any indication of

6   what they wanted to do with PSS Internet Services

7   beyond being an internet service provider?

8       A.    At that time I think, I think the only

9   thing they talked about was the dial up subscribers

10  and that that's what they had already been doing.

11      Q.    And that interested you?

12      A.    Yeah.

13      Q.    And did Mr. Millan provide you with any

14  financial information concerning the company?

15      A.    I wish I had that.  He handed me a whole

16  multi-page, for lack of a better term, prospectus

17  which I have lost track of over the years.

18      Q.    Was this something that he gave you before

19  you made your decision to invest?

20      A.    Yeah.

21      Q.    Describe for me as best you can what this

22  prospectus contained?

23      A.    Basically it gave the lowdown on what the

24  company was doing.  It had been incorporated I guess

25  in April of '94.  It was providing dial up services in

16

1   Daytona Beach.   They wanted to expand to other cities
2   in Florida.
3              It didn't give any financial disclosures as
4   in the sense that we have this much cash on hand or
5   whatever.
6         Q.   No financial statement?
7         A.   No financial statement, no.  It did go on
8   to say that they were proposing to sell 25 percent
9   share of the company for $25,000 and they were going
10  to use the capital to expand the business.
11        Q.   What were they going to use the capital
12  for?  What kind of expansion?
13        A.   Buy equipment.  As I recall, in particular
14  at the time they needed modems to add phone lines and
15  I think they may have used some of that money to buy a
16  router and I'm not sure what else.
17        Q.   What other information did this prospectus
18  contain?
19        A.   I don't remember.
20        Q.   What happened to the prospectus?  Do you
21  have any idea?
22        A.   My desk monster ate it.  I just kind of
23  lost track of it.  I don't know if it exists any more.
24  I guess I could tear my house apart and maybe find it.
25        Q.   So you did invest in the company?

17

1        A.    Yeah.

2        Q.    How much money did you invest in the

3    company?

4        A.    Right off the bat, $25,000.

5        Q.    Was that a check that you wrote?

6        A.    I actually think it might have been several

7    because I think I may have borrowed some money on a,

8    you know, line of credit type deal.

9        Q.    It was paid by check?

10       A.    Yes.

11       Q.    Was the check payable to PSS Internet, or

12    checks?

13       A.    As I recall it was.  Part, you know, now

14    that I think about it, part of it I may have

15    actually -- Jeremy was so desperate to get these

16    modems and get these things going, I may have actually

17    made some of the investment as a purchase of modems.

18            In other words, part of the -- I'm not sure

19    this is, this is what happened -- I think I might have

20    used my credit card to order modems for him.

21       Q.    Do you have in your possession records that

22    would reflect the nature and extent of your investment

23    and the manner in which you made it?

24       A.    The checks that I wrote I probably, if I

25    don't have in my possession the bank would have those.

```
1          Q.    What bank?
2          A.    Well, at the time I was banking with
3    SunTrust.  The line of credit could have been one of
4    several.
5          Q.    SunTrust where?
6          A.    It was actually a Sun Bank.  In Fort
7    Lauderdale.
8                I think I wrote a check on an account I had
9    at, it's called Union Planters now.  It was -- I
10   forget what it was before.  Also in Fort Lauderdale.
11         Q.    The sum total of these checks for your
12   initial investment would have equaled $25,000, checks
13   and/or purchases?
14         A.    Checks and/or credit card purchases, yes.
15   $25,000.
16         Q.    What did you get in exchange for the
17   $25,000?
18         A.    I insisted on a stock certificate.
19         Q.    I think it turns out you got 125 shares?
20         A.    Yes.
21         Q.    Did you have any conversations with Jeremy
22   Greenidge prior to making that $25,000 investment?
23         A.    Yeah.  Harold and I actually, we either
24   drove or flew up to Daytona Beach and sat down and I
25   talked to -- had a three-way, I guess.  Jeremy and
```

1   Harold talked to me about the company.  Mostly Jeremy.

2           MR. DAVIS:  Let's go ahead and get this

3       marked.

4           (The document referred to was marked as

5       Defendant's 1 for Identification.)

6   BY MR. DAVIS:

7       Q.   Let me show you what I have had marked as

8   Defendant's Exhibit 1.  Can you identify that for the

9   record?

10      A.   That's a copy of my stock certificate.

11      Q.   Do you have the original --

12      A.   Yes.

13      Q.   -- of that --

14      A.   Yes.

15      Q.   -- stock certificate?

16      A.   Not with me.

17      Q.   But you have it in your possession?

18      A.   Oh, yes.

19      Q.   Now, this shows the issuance date of

20  January 16, 1995.  Would that comport with your

21  recollection as to when these events were taking

22  place?

23      A.   Probably.  It took them a little while to

24  get the certificate to me.  In fact, if I had not kept

25  on harassing him I don't know if I would have ever

1   gotten -- I think he gave it to me to shut me up.

2        Q.    Having seen the date on this thing, it's

3   still your recollection that your investment would

4   have been made September, October --

5        A.    '94.

6        Q.    And you actually got the certificate

7   sometime in January of '95?

8        A.    Uh-huh.

9        Q.    One of the other rules we have here is that

10  even though you know what I am going to ask you --

11       A.    Wait until you finish.

12       Q.    -- let me get the question out.

13       A.    Okay.

14       Q.    So how many conversations would you say

15  that you had with Jeremy Greenidge prior to making

16  your investment in October of 1994?

17       A.    You mean concerning this investment?

18       Q.    Yes.

19       A.    Just the one.

20       Q.    When would that have been?

21       A.    Also in October of '94.

22       Q.    Before you actually started cutting checks?

23       A.    Started cutting checks.

24       Q.    Who was present -- first of all, was that a

25  face-to-face meeting?

1      A.    Yes.

2      Q.    Who was present during that meeting?

3      A.    Just Jeremy, Harold Millan and myself.

4      Q.    Take me through, as best you can recall,

5    what was discussed at that meeting and who said what

6    to who?

7      A.    Well, Harold, prior to that meeting, had

8    pretty well gone over the ins and outs, what the

9    company was doing, what they were looking for, why

10   they wanted me to invest and so I walked in

11   optimistically, fairly certain that I was going to

12   invest in this.

13     Q.    Okay.

14     A.    Based on what Harry had told me.

15     Q.    Just so we have a complete record here, why

16   don't you tell me just before you had this three-way

17   meeting what Harold had told you, as specifically as

18   you can, about those subject matters?

19     A.    Well, I have already covered it.  The fact

20   that they had started this company, it was actually an

21   off-shoot of Harold's heavy equipment support company

22   which was called Product Support Services,

23   Incorporated, hence the PSS.  This was an off-shoot of

24   that, that he and Jeremy had started it, that they

25   were up and running in Daytona Beach as a dial up

1  internet service provider, that they wanted to expand

2  the company, that they had set aside a 25 percent

3  block of shares for the price of $25,000 for someone

4  to join the company as another investor.

5      Q.    Did he tell you who the officers of the

6  company were?

7      A.    Yeah.  He said it was just Jeremy and

8  himself.

9      Q.    Did he describe what office they held

10  within the company?

11      A.    Yeah.  I think he did say that Jeremy was

12  the president and he was the vice-president.

13      Q.    Did he describe to you what the percentage

14  of share ownership was as between himself and Jeremy?

15      A.    He did but I don't -- all I recall is that

16  Jeremy had a slightly larger share than he did but I

17  don't think he ever mentioned the exact percentages.

18      Q.    Did Mr. Millan describe to you who the

19  corporate directors were of the company?

20      A.    Yeah.  He, himself and Jeremy and Jeremy

21  was the managing director.

22      Q.    How did -- is there anything else you can

23  recall Mr. Millan telling you about the company or

24  what it's prospects were prior to this three-way

25  meeting that you have not already testified to?

23

1      A.     No, I think that pretty, I pretty have
2   covered it.  I don't know that he necessarily talked
3   about the prospects of it.  I guess everybody who
4   starts a company has optimistic goals in mind.  I
5   don't think anyone starts a company to lose money so
6   he was very, he had an optimistic attitude about it.
7      Q.     Did the amount that would have to be paid
8   for the 25 percent investment, did that come up in
9   your discussions with Mr. Millan?
10     A.     Yeah.
11     Q.     What was discussed about that?
12     A.     They basically, they set the price at
13  $1,000 for a percent and they had a block of 25
14  percent that was up for sale.
15     Q.     Did you inquire as to how that price was
16  set?
17     A.     No.
18     Q.     Did you request any financial information
19  to ascertain whether or not the corporation had any
20  assets?
21     A.     No.  Did I ask for proof?  No, I did not.
22     Q.     How did the three-way meeting then between
23  Mr. Millan, Mr. Greenidge and yourself come about?
24     A.     Well, I wanted to see the operation more
25  out of curiosity than anything else and I do believe

24

1   that we flew one of my airplanes up there one

2   afternoon or one evening.

3          Jeremy picked us up at the airport.  We

4   went to the office, PSS Internet's office and sat down

5   and Jeremy pretty much reiterated exactly the same

6   things that Harold had discussed with me.

7       Q.   As best you can recall, tell me what Jeremy

8   said to you?

9       A.   I'll tell you what Jeremy said to me that

10  clinched the deal for me, that I was definitely going

11  to turn over my 25,000 hard earned dollars.  He said

12  by buying into this you're buying into America Dot Com

13  which is going to be some pretty pricey real estate,

14  and he used those words, pricey real estate.  He said

15  I don't think you can lose by buying into this because

16  of the name America Dot Com.

17      Q.   Did you have any idea of the existence of

18  the American Dot Com domain name prior to that

19  conversation?

20      A.   No.

21      Q.   That's the first time you had ever heard of

22  it?

23      A.   I should back up.  It was Harold, at least,

24  had mentioned it prior to that time, that that was the

25  name of the domain for PSS so I'm sure that I had

25

1    heard of it from Harold prior to that conversation.

2        Q.    Did you do anything to verify the accuracy

3    of anything that Harold might have told you about

4    America Dot Com prior to this three-way meeting with

5    Mr. Greenidge?

6        A.    No.

7        Q.    What else did Mr. Greenidge have to say to

8    you at this meeting at PSS?

9        A.    It's quite a while and like I said, he

10   pretty much reiterated what Harry had told me prior to

11   the meeting, the lowdown on the company and like I

12   said, I walked in there with a pretty positive

13   attitude that I was going to do this and, you know,

14   Jeremy's words to that effect clinched the deal for me

15   because I realized yes, America Dot Com was pretty

16   pricey real estate and that would protect my $25,000

17   investment.

18       Q.    What gave you that feeling or

19   understanding?

20       A.    You know, reading what was going on in the

21   newspapers at the time, news magazines, that the

22   Internet was catching fire, it was going to be the

23   next big thing, everybody was going to be wired, so on

24   and so forth, you know.  That's exactly how it

25   happened, how it has come about five, six years later.

26

1    It has exploded.

2         Q.    Did Mr. Millan have anything to say to you

3    in addition to what he had already told you at this

4    three-way meeting?

5         A.    Not that I recall.  Nothing additional.

6         Q.    Prior to this three-way meeting, had you

7    had other personal contact with Jeremy Greenidge?

8         A.    Just what we talked about at the beginning,

9    casual acquaintance.  I might have run into him at

10   gatherings or friends in Daytona.

11        Q.    At any of these other times when you would

12   have run into him, can you recall any conversations

13   concerning PSS Internet?

14        A.    No.

15        Q.    Or the nature of the business?

16        A.    No.  I did not discuss PSS Internet with

17   Jeremy prior to this meeting.

18        Q.    Is it fair to say then that the only

19   conversations that you had with Mr. Greenidge

20   regarding that subject matter before the time you

21   actually started shelling out money was that three-way

22   meeting?

23        A.    Yeah.

24        Q.    In relation to the time of that three-way

25   meeting, when did you then cut the first check or make

27

1  the first purchase?

2      A.    I'm not sure.  I may have done it that

3  night or that afternoon.

4      Q.    But it was substantially right about then?

5      A.    Yes.  If it wasn't that day it was within a

6  week but I think it might have been that day.

7      Q.    Is there anything else that you can

8  remember Jeremy Greenidge saying to you about PSS

9  Internet other than what you have just described at

10  this three-way meeting prior to the time you made your

11  investment?

12      A.    No.  Well, I think maybe he talked a little

13  bit about the fact that my investment would give him

14  the opportunity to expand into Orlando.  I think that

15  happened at that meeting.

16      Q.    Expand the internet provider service --

17      A.    Into Orlando.

18      Q.    Into Orlando?

19      A.    Right.  I think he mentioned that but that

20  was one of the key things that my $25,000 was going to

21  do for the corporation.

22      Q.    Anything else that you can remember him

23  saying to you at this three-way meeting?

24      A.    No.  I'm sorry, I don't.  I don't recall

25  anything else.

28

1          Q.    You came away from this meeting with a mind

2   set that you were going to invest; is that correct?

3          A.    Yes.  If I had not already, I think, like I

4   say, I may have written a check already when I came

5   away from the meeting.

6          Q.    Did you have any understanding as to

7   whether or not you were going to be an officer of the

8   corporation?

9          A.    Yes.

10         Q.    What was your understanding?

11         A.    That was part of the prospectus that was

12  presented to -- like I said, my desk monster ate it --

13  did say that a seat on the board of directors would

14  come with the 25 percent investment.

15         Q.    And a position as an officer?

16         A.    I don't recall.

17         Q.    So did anybody say anything to you at this

18  three-way meeting with Mr. Millan, Mr. Greenidge and

19  yourself to give you the understanding that you were

20  going to be a director as opposed to something on a

21  piece of paper?

22         A.    I don't recall.

23         Q.    And what did this prospectus that you're

24  talking about actually say in connection with a

25  position on the board of directors of the company in

29

1   exchange for your investment?

2       A.    That along with the investment of $25,000

3   for a 25 percent share, that a seat on the board of

4   directors would be part of the deal.

5       Q.    And at the time that you made your $25,000

6   investment, is it fair to say that you did that

7   predicated on an understanding that you were going to

8   become a director in the company?

9       A.    Well, yeah.  That was the way the deal was

10  presented so that was my understanding.

11      Q.    Have you at any time in connection with

12  your association with this company attended a

13  shareholders meeting where you were, in fact, voted as

14  a director?

15      A.    A formal vote, no.

16      Q.    Have you ever seen a resolution in writing

17  where you were voted in as a director of the company?

18      A.    No.

19      Q.    Have you ever requested in writing that

20  such a meeting be held by the shareholders to, in

21  fact, establish you as a director in the company?

22      A.    No.

23      Q.    Why not?

24      A.    I didn't know it was necessary.  I just

25  assumed, which I obviously should not have, that the

30

1    next time they sent a corporate statement with their

2    fee that they would add my name to it and I never

3    followed up.   That's something right now that I

4    regret.

5        Q.    In 1995, after making your investment, did

6    you follow the company as to how it was doing --

7        A.    Oh, yeah.

8        Q.    -- what it was doing?

9        A.    Yes.

10        Q.    What did you do to follow the company's

11    activities?

12        A.    I actually went up there, I mean not often,

13    but at least every couple of months to see how the

14    operation was doing.

15            I actually went up there and did some

16    clerical work, put in subscribers, setting up

17    subscriber accounts for people that had applied to

18    become customers.   Jeremy showed me how to do that and

19    I sat there with a pile of papers and put them, set up

20    accounts for them in the computer.

21        Q.    Did you follow the company in the context

22    of how it was doing financially?

23        A.    Yes, but I will admit all the information

24    that I got was secondhand through Harold Millan.

25        Q.    What kind of information?

1        A.    Well, Harold lives down here in Miami, I

2    live in Fort Lauderdale.  Like I say, we socialize a

3    lot.  We have seen a lot of each other.  Harold had

4    the time, means and the wherewithal to go to Daytona

5    on a regular basis to participate in the company

6    whereas I only went on a very sporadic basis, so

7    Harold had a better hands on the pulse of PSS Internet

8    Services, so I would, you know, query Harold on how it

9    was doing, how are, what was going on, so on and so

10    forth.

11        Q.    Did you consider him to be a trustworthy

12    source of information?

13        A.    Sure.

14        Q.    Do you still consider that to be the case?

15        A.    Yeah.

16        Q.    Have you ever known him to say anything to

17    you about this company that you now have learned to be

18    untrue, meaning Harold?

19        A.    Yeah, Harold.  No.  I think Harold has been

20    truthful.

21        Q.    So based upon this information that he was

22    providing you concerning the financial aspects of the

23    company, how was it doing in terms of --

24        A.    Struggling.  It continued to struggle I

25    guess for the whole time that it operated.

32

1      Q.    Did anybody provide you with any
2  information or explanation as to why it was
3  struggling?
4      A.    I think it was struggling because
5  competition was rearing its ugly head.  That was
6  competition that was not anticipated.  It just
7  continued to get more and more cut throat.
8            Our prices had to drop to meet the
9  competition and that caused a struggle.
10     Q.    Did there come a time when PSS Internet
11 ceased doing the internet service providing business?
12     A.    Yes.
13     Q.    When was that?
14     A.    I was racking my brain to come up with the
15 date.  I think it was, and I can't set a particular
16 date to it, I think it was in the fall of '97.  I
17 think it was.
18     Q.    Was there any kind of meeting of the
19 shareholders to decide well, maybe we are not making
20 it so --
21     A.    No.
22     Q.    -- let's cease doing business?
23     A.    No.
24     Q.    How did you become aware that PSS Internet
25 was no longer in business?

1      A.    Harold called me and said BellSouth had cut

2    the telephone lines off.  Evidently they were in a

3    pissing contest with Jeremy over fees for a T-1 line

4    that Jeremy had arranged for one of our clients and

5    evidently the phone company said PSS was responsible

6    for the monthly fees, Jeremy said the client was and

7    since BellSouth had the ability to pull the plug on

8    us, almost literally, they did and that was the end of

9    it.

10      Q.    From that point forward, PSS Internet no

11    longer did the service, internet service providing

12    business?

13      A.    Correct.  You can't provide dial up service

14    without a dial up.

15      Q.    Between the point in time that you became a

16    shareholder and the point in time that the company

17    ceased doing business, did the company file income tax

18    returns?

19      A.    I don't know.

20      Q.    Did you ever receive copies of the

21    company's income tax returns during that time period?

22      A.    No.  I don't think I received any official

23    correspondence from the company.

24      Q.    Did you ever receive any IRS form K-1s or

25    1099s associated with this company?

34

1      A.    No.

2      Q.    Have you written off your $25,000

3   investment as a loss?

4      A.    No.

5      Q.    At any time since investing in 1994, have

6   you asked either Mr. Millan or Mr. Greenidge to

7   confirm that you, that you were a director in the

8   company?

9      A.    No.

10      Q.    Any particular reason why not?

11      A.    Well, like I said, I assumed that it was

12   part of the deal that was presented to me so I assumed

13   that the paperwork was done.

14      Q.    Are you aware -- at any time prior to your

15   investment in 1994 did you become aware that there

16   were other domain names other than America Dot Com

17   registered in the name of PSS Internet?

18      A.    Yes.

19      Q.    How did you become aware of that?

20      A.    I think Jeremy told me.

21      Q.    What did he tell you?

22      A.    Oh, prior to the time of the investment?

23      Q.    Yes.

24      A.    No.  No.  I take that back.  It was not

25   prior to.  It was probably after.

1        Q.    How did you become aware of that?

2        A.    Like I say, I went up there and was doing

3    some clerical stuff, learning the ropes, basically.    I

4    just invested in a company, kind of a new toy so I

5    wanted to play with it and Jeremy was sitting there in

6    the office doing his thing and we are talking, talking

7    and he mentioned that these other names had been also

8    registered in the company.

9            He only mentioned the other three.

10    Evidently he had a whole slew of them but the other

11    three were the ones that he mentioned.

12        Q.    What were the other three?

13        A.    Earth Dot Net, which he said he was setting

14    up on another server to do some kind of, some kind of

15    computer chores.  I don't know.  I'm not a computer

16    expert.

17            Universe Dot Net and Worldwide Dot Net.

18        Q.    Did he say to you who had paid the

19    registration fees for any of these domain names that

20    were registered in the name of PSS Internet?

21        A.    No, he never mentioned it.

22        Q.    And I include in that America Dot Com.

23        A.    No, he never mentioned who wrote the check

24    or whose credit card it was on.  Nothing like that.

25        Q.    At any time while you were involved in PSS

36

1   Internet before it ceased doing business, did you see

2   any indication that PSS Internet had paid registration

3   fees for these domain names?

4       A.    No.

5       Q.    Do you have any knowledge as to who did pay

6   the registration fees for the domain names America Dot

7   Com, Worldwide Dot Net, Universe Dot Net and Earth Dot

8   Net?

9       A.    No.  The company had been up and running

10  for six months, about six months before I came on the

11  scene so I just -- I didn't dig through the paperwork

12  to see who did what at the inception.

13      Q.    Some time subsequently have you come to be

14  aware that there is also a domain name Cosmos Dot Net,

15  C-o-s-m-o-s Dot Net that was also registered in the

16  name of PSS Internet?

17      A.    Yeah, I saw it somewhere.  In fact, just

18  recently.  I'm trying to remember if I saw it on the

19  internet or in paperwork.  Something that I have.

20            Oh, I know.  It was probably in one of

21  these filings here that it's mentioned.  I thought to

22  myself well, that wasn't part of the deal, to my

23  knowledge.

24      Q.    What do you mean wasn't part of the deal?

25      A.    I knew nothing about Cosmos Dot Net.  As

37

1   far as I'm concerned, personally, PSS doesn't have a
2   claim on Cosmos Dot Net because that wasn't one of the
3   four names that Jeremy said he registered to PSS.
4       Q.   Well, in your Amended Complaint at
5   Paragraph 20 of the Complaint, it says, "Plaintiff's
6   unsigned attorney certifies that he contacted Steve
7   Newman, president of GreatDomains, on January 12, 2000
8   to inform him that PSS was the rightful owner of
9   America Dot Com."
10           That's your position in this litigation; is
11  that correct?
12      A.   Yes.
13      Q.   What is all the information that you have
14  been privy to that leads you to the conclusion that
15  PSS was the rightful owner of America Dot Com?
16      A.   That's what was told to me, that I was,
17  when I bought into PSS Internet Service that I was
18  buying that name.  I was buying that pricey real
19  estate that was going to protect my investment.
20  That's what was told to me out of the mouth of Jeremy
21  Greenidge.
22      Q.   Was Mr. Millan present when that was
23  stated?
24      A.   Yeah.
25      Q.   Other than that statement which you have

38

1    testified to, do you have any other information upon

2    which you base the assertion that PSS was the rightful

3    owner of America Dot Com?

4         A.    Well, the fact that PSS was operated as

5    America Dot Com.  Everyone knew PSS as America Dot

6    Com.  Now, everyone knew PSS Internet Service.  All

7    the subscribers would refer to us as America Dot Com.

8              Also, if you went to their web site, the

9    America Dot Com web site, you know, it said there that

10   it was, these names were all copyrighted terms of

11   America Dot Com -- I mean of PSS Internet.  Right on

12   their web site.

13        Q.    Do you have any knowledge of the existence

14   of a license agreement --

15        A.    No.

16        Q.    -- between Mr. Greenidge and PSS Internet

17   concerning the use of the domain name America Dot Com?

18        A.    No.

19        Q.    You don't have any knowledge of that one

20   way or the other?

21        A.    Just that now Jeremy contends that there

22   was one but no, I don't have any firsthand knowledge.

23   Just what Jeremy has said.  I have not even heard from

24   Harold on that.

25        Q.    So Mr. Millan has never said anything to

39

1    you one way or the other --

2          A.    Not one word.

3          Q.    -- to confirm that?

4          A.    Not one word.

5          Q.    Do you have any knowledge as to the value,

6    current value of the domain name America Dot Com?

7          A.    Currently?  Who's to say.  It really

8    depends on what somebody would bid and buy it for.

9                I know that -- what's the name of the

10   company that Jeremy contracted with to sell it --

11   Great -- is it GreatDomains?  I think it's

12   GreatDomains -- I know they have an asking price of 30

13   million on the web site.  Whether anybody would pay

14   that much remains to be seen.

15         Q.    Well, do you believe that the asking price

16   is indicative of value?

17         A.    I think 30 million, I think 30 million is

18   and was high.  I think in the year since this

19   litigation with the high profile demise of many dot

20   com companies, that it's actually probably lost some

21   value just because people are going to be skeptical

22   about dot coms in general.

23               But how much is it worth?  Who's to say?  I

24   really could not.

25         Q.    Are you aware of or privy to any offers to

40

1    purchase the domain name America Dot Com?

2        A.    None.

3        Q.    Have you secured any kind of expert opinion

4    as to what its value currently is?

5        A.    None.

6        Q.    Do you have any knowledge of how PSS

7    Internet acquired whatever interest it had in America

8    Dot Com?

9        A.    You mean the details of how?

10       Q.    Yes.

11       A.    Do I have any firsthand knowledge?

12       Q.    Yes.

13       A.    No.

14       Q.    In the Complaint, or the Amended Complaint

15   filed in this action, Paragraph 13 says, "Sometime

16   after November 19, 1999, Greenidge, acting alone and

17   without PSS Board of Directors knowledge, contracted

18   with GreatDomain to market, auction and sell the

19   domain name America Dot Com over the Internet."

20           How did you first become aware of that?

21       A.    That the contract was let to sell it?

22       Q.    Yes.

23       A.    Harold told me.

24       Q.    And when was it that Harold told you that?

25   Harold Millan?

1     A.    Harold Millan, yes.

2         Sometime around that time, November 19th,

3  1999.  I don't know exactly when.

4     Q.    How did it come up in conversation with

5  Harold?

6     A.    I don't know whether he called me or if I

7  called him just to talk about whatever, you know.

8  Like I said, we have been close friends over the

9  years.

10     Q.    What did Harold say to you?

11     A.    He told me that Jeremy had found someone to

12  auction the name off and that they were going to have

13  a big PR media campaign to try to boost the price,

14  that I could go to, and I think it was GreatDomain, I

15  could actually go to their web site and see it listed.

16     Q.    Was he accusing Jeremy of doing something

17  Jeremy didn't have authority to do?

18     A.    Was he?

19     Q.    Yes.

20     A.    No.

21     Q.    The allegation is that the, this was done

22  without the board of director's knowledge.  How do you

23  know that to be true?

24     A.    Well, I still maintain that my investment

25  included a seat on the board of directors and at the

42

1    very least I should have been informed that this was

2    going on, so while Jeremy and Harold Millan may have

3    known in advance that this was going on, nobody told

4    me.

5        Q.    As of November of 1999, you had not

6    received any kind of a piece of paper saying you were

7    a director; correct?

8        A.    Correct.

9        Q.    Do you know whether or not Mr. Millan and

10   Mr. Greenidge, as directors of PSS Internet, may have

11   authorized the offer for sale of America Dot Com?  Do

12   you know one way or the other?

13       A.    Firsthand knowledge, no.

14       Q.    How about secondhand knowledge?

15       A.    Secondhand knowledge, I knew Harold Millan

16   had told me but between the time that the company

17   actually stopped providing services and shut its doors

18   until November 1999, Harold had told me on several

19   occasions that Jeremy was working on getting the name

20   sold.

21            He was being very methodical about it

22   because he wanted the best price.  He was

23   investigating many avenues.  What those avenues were I

24   don't know but that he was investigating many avenues

25   in search of the best price and I had no objection to

1  that and obviously Harold didn't either because our

2  conversations didn't, when they took place, they

3  didn't have any kind of anger, you know, on his part,

4  oh, Jeremy is, you know, usurping the authority or

5  anything like that.

6         Harold went along with it, too.  We both

7  actually went along with the fact that Jeremy was

8  trying to sell the name.

9     Q.   Is it fair to say when you're having these

10 conversations with Harold that your assumption is that

11 Jeremy is trying to sell the name on behalf of PSS

12 Internet?

13    A.   Yeah.

14    Q.   Now, the allegation here, though, says that

15 he is out there doing that in November of 1999 without

16 PSS Internet's directors consent or knowledge.

17    A.   Uh-huh.

18    Q.   My question to you is:  When did you become

19 aware that that was the case?

20    A.   That --

21    Q.   That Mr. Greenidge was out attempting to

22 sell America Dot Com, not necessarily on behalf of PSS

23 Internet?

24    A.   When did I become aware that -- let me see

25 if I have this straight in my mind.

1          When did I become aware that he was selling

2    it, the way I would put it, out from under PSS

3    Internet?

4        Q.    If that's how you want to characterise it,

5    that's fine.

6        A.    Okay.  In November of 1999 when I went --

7    Harold actually told me that Jeremy had moved the name

8    of the corporation, or the name of the domain America

9    Dot Com to an offshore company for tax reasons and

10   that he had contracted with GreatDomain, so I went --

11       Q.    When Harold told you that, did he tell you

12   that in the context of that was something that Jeremy

13   should not have done?

14       A.    No.

15       Q.    Now, Harold was on the board of directors

16   of PSS Internet at that time; is that correct?

17       A.    Yeah.  I assumed I was, too, at that time.

18       Q.    Right.  My question was:  When Harold told

19   you this, did Harold indicate to you that this was

20   something that Jeremy had done without the consent or

21   authorization of the directors of PSS Internet?

22       A.    He did not say that.

23       Q.    What is the basis of the allegation here in

24   Paragraph 13 that that was, in fact, done without the

25   board of directors knowledge of PSS Internet?

45

1    A.    Like I said, I had assumed all along that I
2    was on the board of directors.  It was a done fact
3    before I found out about it.
4    Q.    So the basis of this allegation then is the
5    assumption that you were a director?
6    A.    Yes.
7    Q.    And you weren't informed?
8    A.    Correct.
9    Q.    Do you know one way or the other as to
10   whether or not Mr. Millan was informed or consented to
11   this transfer from PSS Internet to America Dot Com,
12   Inc., in advance of the transfer?
13   A.    He didn't say that to me, sir.  That's a
14   question you would have to ask him.
15   Q.    You don't know one way or the other?
16   A.    I don't know one way or the other.
17   Q.    So is it fair to say that if the only two
18   directors of PSS Internet were Mr. Greenidge and
19   Mr. Millan, it's entirely possible, as far as you
20   know, that this transfer was effectuated with both of
21   their knowledge?
22   A.    That's very possible.
23   Q.    In the Amended Complaint under the count,
24   it's Count II for Fraud, it says, "Greenidge engaged
25   in a series of fraudulent acts and representations

1  each of which is independently actionable."

2          Can you tell me in your words what acts of

3  fraud or misrepresentations Mr. Greenidge engaged in

4  in the context of the PSS Internet transaction?

5      A.     Going on the assumption that America Dot

6  Com was a property of PSS Internet Service, which is

7  my contention, the very fact that he used his ability

8  as the administrator of the name America Dot Com to

9  change the registration to the company America Dot Com

10 in Tortola, a new corporation, move it offshore.

11     Q.     That was something that you didn't become

12 aware of until after it was done; correct?

13     A.     Correct.  I maintain that is fraudulent.

14     Q.     It says again in your Amended Complaint,

15 Paragraph 33, "On or about November 19th, 1999,

16 Greenidge represented to Network Solutions, Inc. that

17 he owned America Dot Com.  This representation was

18 false when made and was known to Greenidge to be

19 false."

20          On what basis do you allege that that

21 representation was false when made?

22     A.     I think I have already answered that, that

23 he never owned it.  It was the property of PSS

24 Internet, so he makes the allegation that he owns it,

25 then that's a fraudulent allegation.

1    Q.    But you would agree with me as you sit here

2  today you don't know the facts surrounding how PSS

3  Internet got whatever rights it had in the name of

4  America Dot Com?

5    A.    No.  I only know what was told to me by the

6  principals involved at the time before I made my

7  investment.

8    Q.    You have used the term principals, plural.

9  Did somebody else --

10    A.    Harold and Jeremy.

11    Q.    What did Harold say to you about America

12  Dot Com, PSS internet?

13    A.    Basically the same thing, the pricey real

14  estate statement, but America Dot Com was the domain

15  name of PSS Internet.

16    Q.    That is a true statement at the time;

17  correct?  I mean it was?

18    A.    Correct.

19    Q.    Did he say anything beyond that, though, in

20  terms of --

21    A.    Did he say that America Dot Com was the

22  domain name licensed to PSS Internet or words to that

23  effect?  No.

24    Q.    Or did he say any words to the effect of

25  what the relationship was as to how it came about that

48

1  PSS Internet was using that domain name?

2      A.    No.

3      Q.    Did Mr. Greenidge?

4      A.    Well, like I stated before, I think his

5  words were fairly obvious, that if I am going to

6  invest $25,000 into the pricey real estate of America

7  Dot Com, then that's where my interest lies, not in

8  PSS.

9      Q.    What did you take pricey real estate to

10 mean?

11     A.    See the bank buildings on Brickell Avenue?

12 Compare that to the swamp lands in the Everglades.

13 That's pricey real estate.  America Dot Com is pricey

14 real estate.  Podunk Dot Com is not.

15     Q.    Did you take it to mean that it was a

16 revenue producing asset?

17     A.    That it was a valuable asset in and of

18 itself.  If I have a block of gold here, it's not

19 going to produce any revenue for me but it's a

20 valuable asset.  That's how I looked at it.

21     Q.    With a view of selling it some day?

22     A.    Not necessarily.  Depends on the direction

23 the company took.

24     Q.    Well, I'm just asking you when you were

25 hearing this conversation, pricey real estate, you

1  know, what was going on in your head in terms of why

2  is this a valuable asset?

3       A.    Well, it's a, you know, it's just like

4  gold.  It's valuable in and of itself.  If I never

5  sell it the value is still there and I may not ever

6  sell my block of gold.  That doesn't change its value.

7       Q.    Now, as a result of the acts of fraud which

8  you have described, how have you personally been

9  damaged as opposed to PSS Internet?

10      A.    How have I personally been damaged?  Well,

11 my investment in PSS Internet without, without that

12 asset of PSS Internet, my investment is basically down

13 the drain.  It's gone.

14      Q.    What was the total cash extent or dollar

15 extent of your investment as you sit here today?

16      A.    The $25,000 plus three or $4,000 that I

17 have paid for a computer that Jeremy used to --

18      Q.    That's the computer which is the subject

19 matter of another Count in this --

20      A.    Somewhere in there.

21      Q.    So basically, personally you have lost your

22 investment is what you're saying; correct?

23      A.    If -- if I lost my investment?  Well,

24 depending on the outcome of this; possibly yes,

25 possibly no.

50

1    Q.    Well, let me back up and I will ask it this

2    way:  How has the corporation, PSS Internet, been

3    damaged by virtue of these acts of fraud which you

4    attributed to Mr. Greenidge?

5    A.    Well, without America Dot Com as its

6    largest asset, PSS Internet is worthless.  It could be

7    worth a lot of money.

8    Q.    But as you sit here today, you have no idea

9    what the value is of the America Dot Com domain name;

10   correct?

11   A.    No, but can I add something to that?  I

12   think it will probably fetch over one million dollars.

13   Q.    Has somebody told you hat?

14   A.    No.

15   Q.    Have you seen any document that would give

16   you any indication that that would be the case?

17   A.    No.  Until you sell something you don't

18   know what you can get for it.

19   Q.    Has anybody made any offers that would give

20   you --

21   A.    No.

22   Q.    -- reason to believe that that is the case?

23   A.    No.

24   Q.    So what is that opinion based on?

25   A.    The fact that business, a business, dot

51

1    com, sold for over a million dollars.   I think

2    America, it's based totally on my opinion, that

3    America Dot Com is a more valuable domain name.

4         Q.    In the conversion count, which is Count

5    III, it says that, "America Dot com, meaning

6    Greenidge, and America Dot Com, Incorporated,

7    converted to their own use the domain name America Dot

8    Com of a value between 10 million and 50 million

9    dollars."

10        Do you know what that allegation was based

11   on?

12        A.    Probably based on the asking price at

13   GreatDomain but I'm not really sure.

14        Q.    But you have never seen any offer in the

15   range of 10 to 50 million dollars for this?

16        A.    No.  GreatDomain, if they have offers, they

17   don't make them available.

18        Q.    I mean it was posted on GreatDomains at an

19   offering price of 30 million dollars; correct?

20        A.    Correct.

21        Q.    There have not been any takers, to your

22   knowledge?

23        A.    To my knowledge, right.

24        May I sad something?

25        Q.    Sure.

52

1  A.  I would say that since they are in the
2 business, GreatDomain probably has a good idea of the
3 worth of this.
4  Q.  Have you asked them?
5  A.  Have I asked them?  No.
6  Q.  Have you ever seen the Articles of
7 Incorporation of PSS Internet?
8  A.  No, I haven't.
9  Q.  Do you know who currently the other
10 shareholders are of PSS Internet?
11  A.  Do I know who they are?
12  Q.  Yes.
13  A.  I think I do.
14  Q.  All right.  Who do you think the other
15 shareholders are?
16  A.  Jeremy Greenidge, Harold Millan and Chuck
17 Henderson.
18  Q.  Do you have any idea, without me showing
19 you papers and documents, as to the number of shares
20 each of these individuals has?
21  A.  In my correspondence with Chuck, which I
22 believe you have copies of, I think he said he had a
23 stock certificate for five percent -- two percent -- I
24 forget.  I would have to look.  For a small
25 percentage.

53

1      Q.   Do you know how it came about that he

2   became an investor in PSS Internet?

3      A.   Firsthand knowledge, no.  I have not asked

4   Chuck.  I barely know him.  I could only say what I

5   heard secondhand.

6      Q.   What did you hear secondhand and from whom?

7      A.   From Harold, of course, my endless source

8   of information.

9           I heard that Jeremy sold Chuck some of his

10  stock so that he could buy a car.

11     Q.   Do you know what he paid for it?

12     A.   Not a clue.

13     Q.   Have you ever spoken to Mr. Henderson about

14  PSS Internet?

15     A.   Yeah.  About a year ago, I think it was,

16  the last time I spoke to him.

17     Q.   Do you know where Mr. Henderson is?

18     A.   The last I heard he lives in North

19  Carolina.

20     Q.   The last time that you had any contact with

21  him, was that before the lawsuit was filed?

22     A.   I don't recall if it was, if it was after

23  the lawsuit was filed.  It was probably very shortly

24  thereafter but I --

25     Q.   Did you call him or did he call you or how

54

1   did you communicate?

2      A.   By telephone.  The last I talked to him by

3   phone was before the lawsuit was filed.

4      I may have e-mailed to him after the

5   lawsuit was filed.  I am not sure of the exact time

6   frame.

7      Q.   Do you know why you would have e-mailed

8   him?

9      A.   Afterwards?  Harold Millan was getting

10  uncomfortable with the whole situation and I just

11  decided that since I -- it must have been afterwards

12  because I had decided that since I had filed a lawsuit

13  that I needed to keep my comments to myself.  I am

14  spending a lot of money on attorneys and I just

15  basically decided that I would communicate anything

16  along the lines of PSS Internet through my attorneys.

17     Q.   Mr. Millan express some lack of comfort to

18  you about the situation at some point in time?

19     A.   Harold is not necessarily uncomfortable

20  with this.  Harold is the type of person that doesn't

21  like friction on a personal level or any other level

22  and Jeremy, who he is a good friends o, and me, who he

23  is also a good friend with, were at loggerheads over

24  this and I guess he felt himself in the middle of this

25  friction and was uncomfortable with that.

55

1               As far as any stance on any of this, I have

2   no idea where Harold stands on any of this.  He has

3   not said and I have not discussed this with him.

4               Since I have not discussed this with him in

5   over a year, I have seen him, we have talked, how is

6   everything going but I have not spoken with him about

7   this in over a year.

8        Q.    Do you have any reason to believe that he

9   would be less than completely truthful in regard to

10  these issues?

11       A.    Do I have any reason to believe that?

12       Q.    Yeah.

13       A.    No.

14       Q.    Do you have any reason to believe that he

15  would be biased towards you or towards Jeremy

16  regarding these issues?

17       A.    I have no reason to believe that.

18       Q.    Have you ever seen the stock certificates

19  of Mr. Millan and Mr. Greenidge?

20       A.    No.

21             May I asked something?

22       Q.    Sure.

23       A.    The last time I talked to Harry about this

24  was probably right around the time the suit was filed,

25  possibly before.  Harold Millan told me he had not

1    seen a stock certificate issued to him.

2        Q.    So if I showed you stock certificates today

3    for Mr. Millan and Mr. Greehidge, this would be the

4    first you would have ever seen them; is that correct?

5        A.    Yes.

6        Q.    Have you ever sought to have a shareholders

7    meeting at PSS Internet with a view towards removing

8    or replacing any of the directors?

9        A.    Yes.

10       Q.    When was that?

11       A.    December of 1999.

12       Q.    Had you already retained counsel to

13   represent you in this matter at that time?

14       A.    Yes.

15       Q.    Who was the counsel?

16       A.    John Rayson.

17       Q.    What did you do in December of 1999 to seek

18   to have directors removed?

19       A.    I called a meeting of the stockholders and

20   the meeting was technically held at Mr. Rayson's

21   office.  Ended up a telephone conference.  Due to

22   technical limitations, although Chuck Henderson wanted

23   to participate, we could not conference call him so it

24   was Harold Millan and Jeremy and myself.

25       Q.    Let me show you --

57

1          MR. DAVIS:  First, let's get it marked.

2          (The document referred to was marked as

3      Defendant's Exhibit 2 for Identification.)

4    BY MR. DAVIS:

5       Q.    Let me show you what I have had marked as

6    Composite Exhibit 2 which purports to be a fax

7    transmission from the offices of John Rayson to Jeremy

8    Greenidge dated January 12, 2000 attaching a copy of

9    something titled Notice of Meeting and also appears to

10   be an agenda.

11      A.    Was it January?

12      Q.    Well, the fax transmission is January 12,

13   2000.

14      A.    Okay.

15      Q.    And --

16      A.    So I have the date of the meeting off.

17      Q.    Fine.

18            That's the meeting?

19      A.    I was off on the date by a month.

20      Q.    So the meeting that this Composite Exhibit

21   number 2 refers to is this meeting that you were

22   testifying to before?

23      A.    That I thought was in December but it

24   actually happened in January.  Yes.

25      Q.    How did it come about that you decided to

58

1   call this meeting?

2       A.    I wanted to -- first of all, I thought we

3   needed to talk about this.

4       Q.    Now, at this point in time, January of

5   2000, PSS Internet had been administratively dissolved

6   by the Florida Secretary of State; correct?

7       A.    Correct.

8       Q.    In fact, that was, the reinstatement of the

9   corporation --

10      A.    It was on the agenda.

11      Q.    -- was going to be on the agenda of this

12  meeting?

13      A.    Yeah.

14      Q.    So was there a conference call which

15  occurred on the agenda which bears the date of January

16  14?

17      A.    Yes, there was.

18      Q.    Where were you and tell me who was

19  participants in the conference call?

20      A.    I was in Mr. Rayson's office and Jeremy

21  evidently was on the phone from Barbados -- I assume

22  it was Barbados since he actually lives down there --

23  and Harold Millan was on the phone from Philadelphia,

24  where he was for work.

25      Q.    And efforts were made to tie Mr. Henderson

59

1   in?

2        A.    Mr. Henderson called but he could not be

3   tied in so we just, I gave him a rundown of what

4   transpired afterwards.

5        Q.    What transpired during this conference

6   call?

7        A.    Well, first thing, Jeremy took hold of it

8   and said that it was an illegal meeting, that I needed

9   to be dismissed, that it needed to be dismissed and

10  that my attorney needed to leave the room.

11       Q.    Did he say to you why, or he express to you

12  why he felt that it was an illegal meeting?

13       A.    I think he told me that I was not a

14  director of PSS Internet.  That was the first times I

15  had heard that from anybody.

16       Q.    This was an attempt to put together the

17  shareholders?

18       A.    Right.

19       Q.    And have a shareholders meeting?

20       A.    Right.  But as you see, I signed it as a

21  director which when I signed it I thought I was.

22       Q.    One of the things that came out of Jeremy's

23  mouth on January 14, 2000 was that you were not a

24  director?

25       A.    That was one of the things that came out of

60

1   his mouth on that day.  Like I said, that's the first

2   time I heard that.

3        Q.    As of that date, you became aware that you

4   weren't a director; is that correct?

5        A.    I became aware that he didn't think that I

6   was a director or that he, for whatever reason, just

7   wanted to tell me that.

8        Q.    What about Mr. Millan?  Did he express a

9   view one way or the other on that?

10       A.    He did not.

11       Q.    What else transpired in this conference

12   call?

13       A.    Basically this agenda, this, this agenda

14   kind of went out the window.  Mr. Rayson left the

15   office at Jeremy's request and --

16       Q.    Well --

17       A.    -- we talked about, we basically talked

18   about this and I told Jeremy we need to get together

19   on this, come up with a plan.  I said I'm, you know,

20   I'm open to something that is going to protect my

21   interests and when we --

22       Q.    What interests did you perceive you needed

23   to have protected as of January 14, 2000?

24       A.    My ownership of the 25 percent of PSS

25   Internet and its major asset, the name America Dot

61

1   Com.

2      Q.    And going down this agenda --

3      A.    We didn't --

4      Q.    Was there a vote on whether or not to

5   reinstate PSS Internet by the shareholders?

6      A.    That was never even talked about. I don't

7   recall that that part was talked about. It may have

8   been but I don't recall that.

9      Q.    Was there a vote of the shareholders on the

10   recall of officers or directors?

11      A.    No.

12      Q.    Was there any kind of consensus reached

13   that wasn't a vote as to whether or not officers or

14   directors should be recalled?

15      A.    At the very beginning, your line of

16   questioning is along the lines that this was an actual

17   shareholders meeting. Like I said, one of the first

18   things that was discussed was that it would not be a

19   shareholders meeting, that Mr. Rayson would leave the

20   office and we would just talk and talk about it, so it

21   was not a, it was not a meeting in any official

22   capacity at that point.

23      Q.    Either shareholders or directors?

24      A.    Right. I would -- that's how I would

25   characterize it. It was three people sitting down

62

1    trying to make sense of the whole thing.

2        Q.    Okay.  What transpired then in terms of the

3    efforts to make sense of all of this?

4        A.    I came away from it with the understanding

5    that Jeremy was going to put together a proposal and

6    e-mail it to me as to how he would like to see this

7    thing resolved.  And it never came.

8        Q.    Did you indicate during the course of this

9    conversation an intention to initiate litigation?

10       A.    I don't know if I specifically said that or

11   not but I think the fact that, you know, I was in a

12   lawyer's office, that I think it was fairly obvious

13   that I was serious about getting it settled.

14       Q.    Well, I mean other than the implications

15   that could be drawn --

16       A.    Did I tell Jeremy that I was going to sue

17   him?

18       Q.    Yes.

19       A.    No, I don't think I did.  I think, I would

20   think that anyone with his -- Jeremy is a smart

21   person.  I think he would infer that from the fact

22   that I was sitting in my lawyer's office.

23       Q.    What did Harold Millan contribute to this

24   conversation?

25       A.    Not much of anything, actually.

63

1          Q.    Did he stake out any kind of position one
2    way or the other?
3          A.    No.
4          Q.    Did you ask him to?
5          A.    No.
6          Q.    Did Jeremy ask him to?
7          A.    Not while we all three were on the phone
8    together, no.
9          Q.    What kinds of things were discussed between
10   you and Jeremy?
11         A.    I think we talked about why he had moved
12   the name of the corporation offshore.  He talked about
13   the tax reasons.
14         Q.    What did he say about tax reasons?
15         A.    Well, I'm not an income tax expert by any
16   means.
17         Q.    Nor am I.
18         A.    That's why I pay a CPA a lot of money every
19   year to do my taxes, and like I say, Jeremy is a smart
20   person and he probably researched this and found out
21   that this was, the islands in the Caribbean is where
22   the tax advantages would be the best to sell this name
23   without having Uncle Sam and/or whoever come looking
24   for money.
25         Q.    Did you express your position that this was

64

1  an asset of PSS Internet?

2      A.    Yes.

3      Q.    Did he respond to that?

4      A.    He said it was not.  It was that, it was

5  licensed, it was a personal asset of his and that it

6  had been licensed to PSS Internet.

7      Q.    And Mr. Millan sat quietly during all this?

8      A.    Sat quietly, yes.

9      Q.    Didn't refute that, did he?

10     A.    No, he didn't refute my contention, either.

11     Q.    So he didn't refute anybody's contention?

12     A.    Like I said, he doesn't like to be in the

13 middle of waves between two friends.

14     Q.    What else was discussed at this conference?

15     A.    Kind of an odd-ball thing that Jeremy

16 brought up, that somebody in Michigan had been

17 fooling, evidently got the pass codes that Network

18 Solutions uses to change registrations and somebody in

19 Michigan had been moving America Dot Com, the domain

20 name, to himself or herself or whoever self up in

21 Michigan and evidently it was going back and forth for

22 a couple of weeks between Tortola and Michigan and

23 Jerry had no idea who this was in Michigan.  He asked

24 that Harry and I help him in that fight to get this

25 guy off the case and I actually did some research on

65

1   it and I narrowed it down to an address in Michigan

2   but that's as far as I ever went with it.

3       Q.    Have you ever sought trademark protection,

4   patent or trademark protection for America Dot Com?

5       A.    Have I?

6       Q.    Yes.

7       A.    No.

8       Q.    Do you know if anybody else has?

9       A.    I would not even know how to go about it.

10      Q.    Back to this January 14 --

11      A.    That was about the end of the conversation

12  when Jeremy said he would get something to me in the

13  next week, let me know the proposal, please help me

14  figure out who this was, why this guy in Michigan was

15  trying to take the name.

16      Q.    Do you know the name of that individual in

17  Michigan?

18      A.    I may have it in the file but I don't

19  remember.

20      Q.    Anything else that you can recall about the

21  conference January 14, 2000?

22      A.    No.  Didn't last very long.

23      Q.    Where were things left at the conclusion of

24  that?

25      A.    That Jeremy was going to get back to me.

66

```
 1              MR. DAVIS:  Let's take a break.
 2          (Discussion held off the record.)
 3              MR. DAVIS:  Go ahead and get that marked.
 4              (The document referred to was marked as
 5          Defendant's Exhibit 3 for Identification.)
 6   BY MR. DAVIS:
 7        Q.   Going back to Exhibit 2 for a moment, in
 8   the Notice of Meeting where you hold yourself out as
 9   being a director, you do that on the basis of what you
10   have testified to, I think that is that you felt that
11   when you bought you were going to be a director;
12   correct?
13        A.   Correct.
14        Q.   And the same goes for your designation of
15   yourself as a director in the agenda; is that correct?
16        A.   Yes.
17        Q.   Let me -- I am going to show you what I
18   have marked as Exhibit 3, purporting to be a hard copy
19   of an e-mail transmission of February 5, 2000 from
20   you, I believe, to Mr. Millan --
21        A.   And --
22        Q.   And Chuck Henderson; correct?
23        A.   Uh-huh.
24        Q.   Is this from you?  Take a minute to take a
25   look at it.
```

67

1        A.    I don't remember.  I think -- yeah.  Okay.

2   Sound like me.  Yeah.

3        Q.    Do you have a recollection of what provoked

4   your sending this e-mail to Mr. Millan and

5   Mr. Henderson?

6        A.    Yeah.  I was trying to get people, Harry

7   and Chuck, to join me in the lawsuit.

8        Q.    So as of the sending of this letter, you

9   had filed the lawsuit, or sending of this e-mail?

10       A.    February 5 -- what's the date of the

11  lawsuit -- yeah, I guess.  I talk about that that was

12  filed in Federal Court, that I was the only plaintiff.

13  Yeah.

14       Q.    You make reference to Jeremy's lawyer from

15  New York.  Did you have contact with a lawyer of

16  Jeremy's in New York?

17       A.    Yes.  Well, correspondence.

18       Q.    What kind of correspondence?

19       A.    He claimed that I sent a letter to Network

20  Solutions, GreatDomains, basically saying that America

21  Dot Com of Tortola didn't own the name America Dot

22  Com, that it was PSS property, please do something

23  about it.  I believe you have copies of those letters.

24       Q.    Uh-huh.

25       A.    And I got a letter back from Mr. O'Conner

68

1   basically saying it's none of your business, before

2   you go on doing this you better see a lawyer. So I

3   did. On the advice of Jeremy's lawyer I got a lawyer.

4       Q.    Did Mr. Millan or Mr. Henderson indicate a

5   willingness to participate with you in the lawsuit?

6       A.    Harry never said anything and I don't think

7   Chuck, I don't think Chuck ever made any mention of it

8   either, that he was willing to participate.

9       Q.    They didn't say they weren't willing to

10  participate?

11      A.    No.

12      Q.    Did they just not respond to your

13  solicitation?

14      A.    Correct.

15      Q.    As of this February 5, 2000 e-mail, PSS

16  Internet had not yet been reinstated; is that correct?

17      A.    As of this point?

18      Q.    Yes.

19      A.    I believe it had, I'm not sure but I

20  believe it had been sent in. I could not say for

21  sure.

22      Q.    Well, let me direct your attention down to

23  the fourth paragraph of the e-mail. Says:  "The

24  attorneys feel that it would be beneficial to revive

25  PSS Internet Service, Inc. with the State of Florida

69

1  so that it can legally do business, i.e. receive back

2  the domain names then contract its own name to auction

3  them.  As it turns out, Jeremy never added me as a

4  director which was promised when I invested.  The only

5  people that can sign the corporate paperwork are Harry

6  and Jeremy.  I doubt Jeremy is interested, so Harry,

7  it's up to you."

8          Does that refresh your recollection as to

9  whether or not --

10     A.    I guess it was, I guess it had not been

11  sent in at that point.

12     Q.    So you were asking Harry to participate in

13  at least the reinstatement of the corporation at that

14  point; is that correct?

15     A.    Yeah, because we had, at that point we had

16  retrieved what corporate papers we could from the

17  State and that's when I found out officially that I

18  was not on any of the paperwork as a director.

19     Q.    As of February 5, 2000?

20     A.    (Witness nods head in the affirmative).

21     Q.    You violated the rule.  Is that a yes?

22     A.    Yes.  I'm sorry.

23     Q.    You state in here that, "When I invested in

24  1994" -- I am starting at the fifth paragraph down --

25  "My understanding was Harry 35 percent, Jeremy 40

70

1   percent.  Eventually, Jeremy sold four percent of his
2   stock to Chuck, but I was not privy to the details.
3   Harry, this mean Jeremy is trying to stick you with 20
4   percent ownership.  If he claims 51 percent, I have 25
5   percent and Chuck has four percent."
6           So at the time that you issued this e-mail,
7   were you not sure as to how the percentage of
8   ownership fell out amongest the various shareholders?
9       A.    I wasn't.  I think Harry had told me that
10  he thought he had 35 percent but he didn't have a
11  stock certificate.  I was just doing the math,
12  basically.
13      Q.    Well, you, in the last sentence on this
14  page, you say, "Harry, I suggest you claim 35 percent
15  in the suit when you join and Chuck claim your four
16  percent."
17      A.    Right.  Because Harry didn't have a stock
18  certificate.
19      Q.    Why were you suggesting them to assert any
20  position with regard to their percentage of stock
21  ownership?
22      A.    I guess I was trying to entice them into
23  the lawsuit with me to stop Jeremy's grab of the
24  asset.
25      Q.    It wasn't an attempt to secure a majority

71

 1  of the stock ownership on your side of the table?

 2      A.    No.  No.  No.  That was not, that was not

 3  my thought at the time.

 4      Q.    Why did it matter to you then what

 5  percentage Harry would assert?

 6      A.    Well, because I think Harry mentioned that

 7  he thought he had 35 percent, so that's what I said

 8  assert that and by that point, I guess Chuck had told

 9  me he had paper, stock certificate for four percent

10  which I had not seen.

11      Q.    Neither Henderson or Millan responded to

12  this e-mail?

13      A.    No.  And that's, when they did not respond,

14  that's basically when I stopped talking -- I believe I

15  may have sent them a follow-up e-mail basically saying

16  I won't even talk to you guys about this any more.  If

17  you have any questions, talk to Mr. Rayson.

18          MR. DAVIS:  Go ahead and get these marked

19      as Composite 4.

20          (The documents referred to were marked as

21      Defendant's Composite Exhibit 4 for

22      Identification.)

23  BY MR. DAVIS:

24      Q.    Let me show you what I have had marked as

25  Composite Exhibit 4 purporting to be two letters

72

1    signed by yourself dated December 16, 1999.

2         A.    These are the ones I talked about.

3         Q.    Your signature appear on each of those

4    letters?

5         A.    Yes.

6         Q.    The first letter to Harris, Beach and

7    Wilcox, was that Mr. O'Conner's law firm at the time?

8         A.    Yes.

9         Q.    You state in the second paragraph of that

10   letter:  "As a member of the board of directors and a

11   large shareholder of PSS Internet Services, I wish to

12   inform you that the transfer of this asset was done

13   without consent of the board of directors."

14             As of the time that you wrote this letter,

15   you considered yourself to be on the board of

16   directors?

17        A.    Yeah.  Like I said, this telephone

18   conference that we had on -- what was the date?

19        Q.    January 14th.

20        A.    January 14th was the first time I had heard

21   from anybody that I was not on the board of directors

22   so when I wrote this, yeah, I assumed that I was a

23   director.

24        Q.    But by the time of the February 5, 2000

25   e-mail you had confirmed by checking with the Florida

1   Secretary of State that you were not, in fact, a

2   director?

3       A.      That I was not on there, correct.

4       Q.      You go on in the same letter in the third

5   paragraph, referring to Mr. Greenidge, saying:  "He is

6   a minority shareholder, one of only four shareholders

7   of the corporation, and had been acting as managing

8   director."

9               On what did you base the assertion that he

10  was a minority shareholder?

11      A.      That Harry had told me that he was a 35

12  percent owner.  Again, I was just doing the math.

13      Q.      The second letter is to GreatDomains Dot

14  Com.  Was it the registering of the sale of America

15  Dot Com with GreatDomains, is that what provoked this

16  letter?

17      A.      I was just, I was trying to stop this at

18  all costs while I could, so it was -- as you see the

19  letters are almost identical.

20              In fact, I sent one to Network Solutions,

21  too, which was pretty much also identical and I was

22  just trying to call a halt to the speeding train, so I

23  sent one to everybody that I thought might have some

24  possibility of slowing it down.

25              MR. DAVIS:  Go ahead and get this marked as

74

1    the next exhibit.

2                (The document referred to was marked as

3        Defendant's Exhibit 5 for Identification.)

4    BY MR. DAVIS:

5        Q.    The letter that you sent to Network

6    Solutions, is that what we have had marked as Exhibit

7    number 5?

8        A.    Uh-huh.

9        Q.    Is that a yes?

10        A.    Is it my letter?  Yes.

11        Q.    And that letter was sent for the same

12    purposes as the ones that were sent to the Harris

13    Beach firm and the GreatDomains?

14        A.    Right.  I had sent Network Solutions the

15    same one basically on 16 December.  Through telephone

16    conversations -- actually, through telephone

17    conversations they said we can't do anything with it

18    unless I get a letter on letterhead in order to stop

19    it, so in order to stop it, I sent a letter on

20    letterhead.

21        Q.    So you sent this letter to Network

22    Solutions on PSS Internet Services letterhead on

23    February 9, 2000; correct?

24        A.    Correct.

25        Q.    Where did you get the PSS Internet Services

75

1   letterhead?

2       A.    It's pretty easy to do, actually.

3       Q.    How?

4       A.    Microsoft Word.

5       Q.    So you developed some of your own?

6       A.    Yes.

7       Q.    And you write in the second paragraph, "As

8   a member of the board of directors and a large

9   shareholder of PSS Internet Services, I wish to inform

10  you that the transfer of this asset was done without

11  the consent of the board of directors."

12           Well, as of February 9, 2000, you were

13  aware that you were not a director?

14      A.    I was aware that I wasn't on the paperwork

15  but I was also aware that since I had filed a lawsuit

16  that judges don't --

17      Q.    Did you believe that the fact that you

18  filed a lawsuit allowed you to hold yourself out as a

19  director of PSS Internet?

20      A.    I needed to stop the sale before it got

21  offshore and became impossible to do anything with and

22  they said they wanted something on letterhead and they

23  got it.

24      Q.    So you did have a previous phone

25  conversation with Network Solutions?

76

1      A.    I think the attorney did.

2      Q.    Your attorney?

3      A.    Yes.

4      Q.    And it was your understanding that PSS

5   Internet had to send something on its letterhead to

6   Network Solutions in order to stop the sale?

7      A.    Evidently that's what they said.  This man

8   Charles Mgugi is an attorney for Network Solutions

9      Q.    The understanding that you were operating

10   under at the time that you sent this letter, February

11   9, 2000, was that Network Solutions needed something

12   on PSS Internet letterhead?

13      A.    Correct.

14      Q.    You then printed this PSS Internet

15   Services, Inc. letterhead on your --

16      A.    Computer.

17      Q.    -- computer; is that correct?

18      A.    That's correct.

19      Q.    And you made the representation that you

20   were a member of the board of directors of PSS

21   Internet; is that correct?

22      A.    Correct.

23      Q.    And that was, as of February 9, 2000, to

24   your knowledge, factually incorrect; would you agree?

25      A.    I disagree.

CERTIFIED SHORTHAND REPORTERS, INC.
MIAMI 305-374-6545 FORT LAUDERDALE 954-925-6545

                                                        77

1          Q.    Okay.   You had checked with the Florida

2     Secretary of State; correct?

3          A.    My contention --

4          Q.    Well, let's follow the questions.

5          A.    Yes, I had checked.

6          Q.    And the Florida Secretary of State had

7     confirmed to you that you were not listed in the

8     corporate records as a director; is that correct?

9          A.    That's correct.

10         Q.    So setting your contention aside that you

11    should be a director, the fact of the matter is you

12    weren't one as of February 9, 2000?

13         A.    Correct.

14         Q.    So the statement in this letter is

15    factually incorrect, that you were a director?

16         A.    Correct.

17              MR. DAVIS:   Mark this.

18              (The document referred to was marked as

19         Defendant's Exhibit 6 for Identification.)

20    BY MR. DAVIS:

21         Q.    Let me show you what we have now marked as

22    Exhibit 6 for Identification, purporting to be an

23    application for reinstatement of PSS Internet

24    Services, Inc..   Does your signature appear on this

25    page?

78

1        A.    Yeah.

2        Q.    Do you hold yourself out as a director of

3    PSS Internet Services in this application?

4        A.    Yes.

5        Q.    Would you agree with me that you were not,

6    in fact, a director of the corporation at the time

7    this application was submitted?

8        A.    I won't answer that.

9        Q.    What do you mean you won't answer?

10       A.    I think -- yes, I signed it on advice of my

11   attorney.  Yes.

12       Q.    You were not a director of PSS Internet

13   Services on February 25, 2000 when you signed this; is

14   that correct?

15       A.    Factually on its face, that's correct.

16       Q.    There had never been a shareholders meeting

17   where you were voted as a director --

18       A.    That's correct.

19       Q.    -- of the corporation as of February 25,

20   2000; is that correct?

21       A.    That's correct.

22       Q.    Likewise there had never been a directors

23   meeting where you were voted as an officer of PSS

24   Internet as of February 25, 2000; isn't that correct?

25       A.    That's correct.

1          Q.    Now, if you look at the middle section of

2    this application for reinstatement, under where it

3    says names of officers and directors, it names

4    yourself as an officer; is that correct?

5          A.    Correct.

6          Q.    That was -- excuse me.  A director.  Says

7    D.

8                That representation was factually incorrect

9    as of February 25, 2000; isn't that correct?

10         A.    Correct.

11         Q.    Now, Harry Millan is likewise listed as a

12   director as of February 25, 2000.  That was factually

13   correct?

14         A.    That's correct.

15         Q.    And Charles Henderson is listed as a

16   director as of February 25, 2000 and that was

17   factually incorrect; right?

18         A.    Correct.

19         Q.    Who is David Matheny?

20         A.    He's my roommate.

21         Q.    Has there been any kind of a shareholders

22   meeting at PSS Internet which would authorize the

23   designation of David Matheny as registered agent for

24   the corporation?

25         A.    No.

80

```
 1        Q.    How did it come about that Mr. Matheny
 2   became the new registered agent for PSS Internet?
 3        A.    He is usually there that he could take
 4   service.
 5        Q.    The address that is listed there?
 6        A.    Yes.
 7        Q.    That is your residence address?
 8        A.    Yes.
 9        Q.    Was Mr. Millan asked to consent to the
10   application for reinstatement?
11        A.    No.
12        Q.    Was Mr. Greenidge?
13        A.    No.
14        Q.    To your knowledge, was Mr. Henderson?
15        A.    No.
16        Q.    To your knowledge, did either Mr. Millan or
17   Mr. Greenidge or Mr. Henderson express any willingness
18   to go along with this application for reinstatement?
19        A.    No.
20        Q.    This was filed with the Florida Secretary
21   of State on March 6, 2000; is that correct?
22        A.    Yes.
23        Q.    Have you filed any other documents since
24   that date seeking to change any of the factual
25   representations contained in this application for
```

81

1    reinstatement?

2        A.    No.

3        Q.    To your knowledge, have the shareholders of

4    PSS Internet ever voted in favor of prosecuting this

5    lawsuit on behalf of PSS Internet?

6        A.    No.  Other than myself, no.

7        Q.    Did you have a meeting and vote?

8        A.    Pardon?

9        Q.    Did you have a meeting yourself and vote?

10        A.    I'm sorry.  I -- I guess in effect I did,

11    yes.

12        Q.    Is there any written resolution

13    memorializing that meeting?

14        A.    No.

15        Q.    To your knowledge, has there been any

16    meetings of the board of directors of PSS Internet

17    authorizing the initiation, prosecution of this

18    lawsuit on behalf of PSS?

19        A.    No.

20        Q.    Who is Andreas Flemke?

21        A.    Harold Millan's roommate.

22        Q.    And what knowledge would he have concerning

23    any of the issues that are involved in this case?

24        A.    He was, he may have been present at the

25    actual inception of the corporation.  He may have been

1    there for meetings.  He is just as a bystander.

2        Q.    Was he present during any of the meetings

3    that you had concerning --

4        A.    No.

5        Q.    -- your making your decision to invest?

6        A.    No, not that I recall.

7        Q.    Was he employed by the corporation?

8        A.    I'm not sure about whether he was employed

9    by PSS Internet Services.  He was employed for a while

10   after PSS incorporated, Product Support Services, and

11   I don't know whether that employment went on to follow

12   or not.

13       Q.    Have you had any conversation with him

14   concerning the issues involved in this litigation?

15       A.    No.

16       Q.    Would David Matheny have any firsthand

17   knowledge regarding the issues involved in this

18   litigation?

19       A.    Possibly.

20       Q.    And what areas?

21       A.    He may have been present for some of the

22   meetings during the course of the actual business.  He

23   worked as a contractor for PSS Internet Services for a

24   short time.

25       Q.    What meetings would Mr. Matheny have been

83

1    present?

2        A.    I'm not sure.  Probably you would need to

3    ask him.  He may not have been.  He's been my roommate

4    for quite a while.  As a bystander he may have.

5        Q.    Would he have been present at the three-way

6    meeting that you testified to where Mr. Greenidge --

7        A.    He was.

8        Q.    He was present at that meeting?

9        A.    Yes.

10       Q.    Would he have been privy to all of the

11   conversations that took place during the course of

12   that meeting?

13       A.    Yes.  He was in the room.

14       Q.    Was Mr. Flemke present during that meeting?

15       A.    To the best of my knowledge, no.  Harold

16   was in Philadelphia.

17       Q.    I'm talking about the meeting where --

18   let's be real clear.

19       A.    Which meeting.  Right.

20       Q.    I'm talking about this meeting where you

21   and Mr. Greenidge and Mr. Millan got together before

22   you started writing any checks where Mr. Greenidge

23   talked about real estate.

24       A.    Okay.  We are on different frequencies here

25   totally.

84

1      Q.    Was Mr. Matheny present at that meeting?

2      A.    No.

3      Q.    What meeting was Mr. Matheny present at?

4      A.    The three-way meeting on the 14th -- was it

5   the 14th of January 2000?  This one.

6      Q.    That was the --

7      A.    The meeting in Mr. Rayson's office.

8      Q.    He was at Mr. Rayson's office?

9      A.    Yes.

10      Q.    Are there any other meetings in this

11   situation that you can recall Mr. Matheny being

12   present?

13      A.    That I -- I don't recall it.  We are

14   talking about a span of six, five or six years but

15   since he was for a short time a contractor for PSS

16   Internet, as a salesman, he may have been present.  I

17   don't remember at whatever meetings over the course of

18   business.

19      Q.    Do you remember him being present in any of

20   your meetings with Mr. Millan before you invested

21   where Mr. Millan was explaining to you what PSS

22   Internet was about?

23      A.    Some of that took place in my home and he

24   could very well have been there, yes.

25      Q.    Sam Bradshaw, what involvement would he

85

1   have had in PSS Internet?

2        A.    He was the, what they call the web master.

3        Q.    What's that?

4        A.    Are you familiar with the World Wide Web?

5        Q.    Sure.

6        A.    Somebody has to administer that, keep

7   things going, change the material, make links and

8   stuff.  Sam did that for PSS Internet.

9        Q.    Was he an actual employee?

10       A.    No.  He was a contractor but his office was

11  in PSS's office.  He had his desk there.

12       Q.    Now, would Mr. Bradshaw have been present

13  during the three-way conversation we are talking about

14  where Mr. Greenidge reputedly talked about the high

15  price of real estates?

16       A.    No.  That meeting -- I know you have to ask

17  this -- that meeting was, we were in an office.  It

18  was just the three of us.  No one else heard that

19  conversation.

20       Q.    Would Mr. Bradshaw have been a participant

21  or involved in or even present during any of your

22  earlier discussions with Mr. Millan before that

23  three-way?

24       A.    I don't think he was there at that time.

25  No.

86

1          Q.    Have you had any conversations with

2    Mr. Bradshaw about the issues in this litigation?

3          A.    No.

4          Q.    May have asked you this but have you had

5    any conversations with Mr. Flemke about the issues in

6    this litigation?

7          A.    No.   You did ask that and it's no.

8          Q.    Aaron Gee, what was his involvement with

9    PSS Internet?

10         A.    He was the office manager, head of

11   technical support.

12         Q.    And Mr. Gee, to your recollection, was he

13   present during any of the formative meetings?

14         A.    No.

15         Q.    I mean the ones before you decided to buy

16   in?

17         A.    No.

18         Q.    Have you had any conversations with Mr. Gee

19   about the issues in this litigation?

20         A.    No.   Not concerning the issues.

21         Q.    Is there anyone else you can think of that

22   we have not mentioned here that may have been involved

23   from the prospective of PSS Internet in connection

24   with your investment in PSS Internet other than

25   Mr. Greenidge and Mr. Millan?

1    A.    No.   Well, like I said, Mr. Matheny may

2    have been present for some of the times when

3    Mr. Millan and I were discussing it in my home before

4    the investment.

5        Q.    Right.  I just want to make sure that I

6    have got the full --

7        A.    Yes.

8        Q.    -- information.

9        A.    Okay.

10           MR. DAVIS:  I know this thing has been

11       noticed for a 30(B)(6) representative.  I assume

12       Mr. Kuhn is here as a 30(B)(6) representative as

13       well?

14           MR. MOSS:  Yes.

15   BY MR. DAVIS:

16       Q.    The action has been bought in your name

17   individually and PSS Internet as a corporation.  Can

18   you describe for me the difference between the damages

19   you claim individually and the ones that you claim

20   should go to PSS Internet?

21       A.    PSS Internet should continue to be the

22   owner of America Dot Com and the other three domain

23   names.  PSS Internet, as a corporation, with those

24   assets, is likely very valuable.  Without them it's

25   like worthless and since I have 25 percent stake in

88

1   PSS Internet, that's my damages, too.  Without those
2   assets my stake in PSS Internet is also worthless.
3        Q.    As you sit here today, you don't have a
4   notion as to what the value of your stake in PSS
5   Internet is, assuming the America Dot Com domain name
6   is still an asset there, do you?
7        A.    Do I know what it's worth without that
8   asset?
9        Q.    No.  With it?
10       A.    No, I don't have a dollar value.
11       Q.    Okay.
12             MR. DAVIS:  Two minutes.  I might be done.
13          (Discussion held off the record.)
14             MR. DAVIS:  I don't have any further
15          questions at this time.
16             Do you have something?
17             MR. MOSS:  I have one issue I would like to
18          clarify and that is --
19                   CROSS EXAMINATION
20   BY MR. MOSS:
21       Q.    Your designation of yourself as a director
22   on some of the correspondence, if you could clarify
23   how it is that you assert yourself to be a director of
24   PSS Internet Services and -- well, first clarify that.
25       A.    Part of the agreement when I made the

1  outlay of $25,000 for my stock in PSS Internet was a
2  seat on the board of directors.  This is what we
3  agreed to over the course of time of PSS doing
4  business.  Jeremy and Harold and myself actually had
5  directors meetings and we called them that.

6          They weren't often.  Probably over the
7  course of doing business we probably formally met
8  three times and we called them directors meeting.  We
9  all three sat down and talked about the course of
10 where the company was going.  Harold and I made
11 recommendations which were usually ignored and it went
12 from there.

13         So as far as the paperwork with the State
14 of Florida, no matter what that maintains, I still
15 maintain that I'm a director and that Jeremy was
16 remiss in not getting my name on there.  He really
17 wasn't up on paperwork because while PSS Internet was
18 in business and actually providing services, he was
19 faulty in letting the status of the corporation lapse
20 once while we were doing business.

21         So obviously he was not a big paperwork
22 fellow.  He was in charge of the whole operation and I
23 just think that it was probably fraudulent on his part
24 that he sold me the stock and a seat on the board of
25 directors and didn't follow up on his end of the deal,

90

1  so that's where I stand on being a director of PSS

2  Internet and I still maintain, despite what the papers

3  say, that I'm a director of PSS Internet.

4          MR. MOSS:  I don't have anything else.

5          MR. DAVIS:  Follow up on that.

6                  REDIRECT EXAMINATION

7  BY MR. DAVIS:

8      Q.    Let's assume you were a director.  That

9  would make you a director, Mr. Millan a director and

10 Mr. Greenidge a director.  What did the bylaws provide

11 concerning the need for a majority vote amongest the

12 directors to do something?

13     A.    51 percent.

14     Q.    Well, in other words, do you know if the

15 bylaws provided that one director out of three could

16 go out and be authorized to act on behalf of the

17 corporation?

18     A.    I have not seen the bylaws so I can't

19 answer that.  I don't know what the bylaws say about

20 directors abandoning their financial responsibility to

21 the corporation, either, but I would love to see them.

22 Or the State law.  Nobody seems to want to answer

23 that.

24     Q.    At the time that you signed Exhibit number

25 6 as a director to reinstate the corporation, what was

91

1   your understanding as to what the bylaws provided

2   concerning one director being able to act on behalf of

3   the corporation?

4      A.    I don't know the answer to that.

5      Q.    What was your understanding as to what the

6   state law provides to that?

7      A.    I don't know the answer to that.

8      Q.    So at the time that you signed this Exhibit

9   number 6, you did it being ignorant of those two

10  facts; is that correct?

11     A.    Correct.

12           MR. DAVIS:  Thanks.  Nothing further.

13      That's it.

14           Waive reading?

15           MR. MOSS:  You have a right to read over

16      the transcript when it's prepared to check for

17      typos and mistakes, errors or you can waive that

18      right and trust that it's recorded correctly.

19      It's up to you.

20           THE WITNESS:  This is my first time.

21      You're the expert here.  You do this stuff all

22      the time.

23           MR. MOSS:  You're not risking much if you

24      waive it.  A lot of people waive it.  If you do

25      not waive it, you will have to be contacted by

92

1      the court reporter and go over and meet with

2      them.

3            THE WITNESS:  Meet with everybody again?

4            MR. MOSS:  No.  Just meet with them and

5      sign it, say that it was transcribed correctly.

6            THE WITNESS:  Then I'll waive it.

7            (Thereupon the deposition was concluded at

8      4 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

93

CERTIFICATE OF OATH

STATE OF FLORIDA)

COUNTY OF DADE)

    I, the undersigned authority, certify that GEORGE
KUHN personally appeared before me and was duly sworn.

*Paul C. Leveritt*

PAUL C. LEVERITT

Notary Public - State of Florida

Commission # CC 839399

Expires June 5, 2003

94

1                          CERTIFICATE

2

3    STATE OF FLORIDA )

4    COUNTY OF DADE    )

5

6              I, Paul C. Leveritt, Court Reporter and

7    Notary Public in and for the State of Florida at Large

8    do hereby certify that  I was authorized to and did

9    stenographically report the deposition of GEORGE KUHN;

10   that a review of the transcript was not requested; and

11   that the transcript is a true and complete record of

12   my stenographic notes.

13             I further certify that I am not of counsel,

14   I am not related to nor employed by an attorney to

15   this suit, nor interested in the outcome thereof.

16             IN WITNESS WHEREOF I hereunto set hand and

17   affix my official seal this ____ day of_____,

18   2001.

19

20                         Paul C. Leveritt
                           Notary Public
21                         Commission # CC 839399
                           Expires June 5, 2003
22

23

24

25

CERTIFIED SHORTHAND REPORTERS, INC.
MIAMI 305-374-6545  FORT LAUDERDALE  954-925-6545



# PSS INTERNET SERVICES, INC.

ORGANIZED UNDER THE LAWS OF THE STATE OF FLORIDA

004

125

This Certifies that GEORGE KUHN

ONE HUNDRED TWENTY FIVE

is hereby issued ONE HUNDRED TWENTY FIVE Shares of the Capital Stock of the above named Corporation and non-assessable Shares of the Capital Stock of the above named Corporation transferable only on the books of the Corporation by the holder hereof in person or by duly authorized Attorney upon surrender of this Certificate properly endorsed.

In Witness Whereof, the said Corporation has caused this Certificate to be signed by its duly authorized officers and its Corporate Seal to be hereunto affixed this 16th day of January A.D. 19 95.

SECRETARY

PRESIDENT



DEFENDANT'S EXHIBIT



**LAW OFFICES OF**
**John C. Rayson**

JOHN C. RAYSON·
THOMAS F. MOSS
·ALSO ADMITTED IN ILLINOIS

LELAND M. RAYSON
OF COUNSEL

2400 EAST OAKLAND PARK BOULEVARD
FORT LAUDERDALE, FLORIDA 33306
TELEPHONE (954) 566-8865
FAX (954) 566-9902

**FACSIMILE TRANSMITTAL**

DATE: 1/12/00

TIME: 3.05 p.m.

Jeremy Greenridge

ATION: _____

FAX NUMBER: 246 - 436 - 9909

ARE TRANSMITTING _2_ pages, including this cover sheet. If
...e transmission is incomplete, phone 954-566-8855.

BY: _____

COMMENTS: _____

Notice of meeting.

_____
_____
_____

_____ As you requested          _____ Please call about this

_____ Please comment            _____ For your files

INFORMATION CONTAINED IN THIS TRANSMISSION IS ATTORNEY PRIVILEGED
AND CONFIDENTIAL.    IT IS INTENDED ONLY FOR THE USE OF THE
INDIVIDUAL OR ENTITY NAMED ABOVE.  IF THE READER OF THIS MESSAGE IS
NOT THE INTENDED RECIPIENT, THE READER IS HEREBY NOTIFIED THAT ANY
DISSEMINATION, DISTRIBUTION OR COPY OF THIS COMMUNICATION IS
STRICTLY PROHIBITED.  IF YOU HAVE RECEIVED THIS COMMUNICATION IN
ERROR, PLEASE NOTIFY US BY TELEPHONE AND RETURN THE ORIGINAL
MESSAGE TO US AT THE ABOVE ADDRESS VIA U.S. MAIL.


DEFENDANT'S
EXHIBIT
#2 Fact)
02-2/28/0,

### NOTICE OF MEETING
### OF
### PSS INTERNET SERVICES, INC.

YOU ARE HEREBY NOTIFIED that there will be a general meeting of directo , shareholders and officers of PSS INTERNET SERVICES, INC., on Friday, January 14, 2000, at 8 a.m. EST, at the LAW OFFICES OF JOHN C. RAYSON, 2400 E. Oakland Park Blvd, Second Floor, Fort Lauderdale, FL 33306, 954-566-8855.

The purpose of the meeting will be to elect officers and directors, to reinstate the corporation as a corporation under Florida Law and to vote to take such action as necessary to reclaim the domain names of america.com, earth.net, worldwide.net, and any and all other business that may come before the directors, shareholders and officers.

By: _George Kuhn_

George Kn

Director & Shareholder

i

ATTENTION:     Jeremy Greenidge (aka Jeremy Green)
               Charles Henderson
               Harold Millan

PSS Internet Services, Inc.

Stockholders' Meeting of 14 January 2000
to be held at 8:00 AM E.S.T. at
The Law Offices of John C. Rayson
2400 E. Oakland Park Blvd.
Fort Lauderdale, FL 33306

Any stockholder unable to attend in person can phone Mr Rayson's office (954-566-8855) at 8:00 AM E.S.T. on 14 January 2000 and be put on conference call for the meeting. Alternately, any stockholder can attend by proxy. Proxies can be faxed to Mr. Rayson's office at 954-566-8902.

AGENDA:

1. Call to order

2. Vote of shareholders on reinstatement of PSS Internet Services, Inc. (a Florida corporation.)

3. Vote of shareholders on recall of any officers and/or directors of PSS Internet Services, Inc.

4. Shareholder nominations and election of new officers and/or directors of PSS Internet Services, Inc.

5. Call to order of Board of Directors meeting of PSS Internet Services, Inc.

6. Floor open to shareholders.

7. New business

Respectfully,

George F. Kuhn, Director
PSS Internet Services, Inc.

## Jeremy Greenidge

| | |
|---|---|
| **From:** | hjmillan@csi.com on behalf of Harold J. Millan [hjmillan@csi.com] |
| **Sent:** | Saturday, February 05, 2000 18:43 |
| **To:** | iwont@fuku.net |
| **Subject:** | Fw: Progress? |

```
----- Original Message -----
From: CaptGTK <captgtk@compuserve.com>
To: <ceh913@bellsouth.net>; <hjmillan@compuserve.com>
Sent: Saturday, February 05, 2000 10:29 AM
Subject: Progress?
```

>
> Chuck and Harry,
>
> Jeremy's lawyer from New York called my attorney a few times this past
> week. We are mystified why they are doing this, since this New York
> attorney was only supposed to handle the legal/money aspects of the sale -
> through Great Domains. Mr. O'Conner (Jeremy's attorney) seems anxious to
> get the name sold quickly. We are trying to figure out why he's so
> interested. I have a feeling we are being sandbagged.
>
> Through Mr. O'Conner, Jeremy made a settlement offer with me. AS you both
> know I own (and can prove) 25% ownership in PSS Internet. Jeremy offered
> me 15% of the first $5 million, 10% of the next $5 million, and 5% of
> anything over $10 million. I laughed when I saw it. I think 25% means
25%.
>
> The lawsuit has been filed in Federal court. One of the many aspects of
> the suit is a request for an emergency injunction against the sale of
> america.com. There will likely be a hearing for this request in the next
> two or three weeks.
>
> The attorneys feel it would be beneficial to revive PSS Internet Service,
> Inc. with the State of Florida so that it can legally do business, i.e.
> receive back the domain names and then contract in its own name to auction
> them. AS it turns out, Jeremy never added me as a director (which was
> promised when I invested.) The only people that can sign the corporate
> paperwork are Harry and Jeremy. I doubt Jeremy is interested, so Harry
> it's up to you! PLEASE call Mr Rayson's office and make arrangements to
> revive PSS asap! I have already sent a check to Mr. Rayson for $1,058.75
> to pay the back fees to get it reinstated. All you have to do is sign it!
>
> Harry, you indicated that Jeremy is now claiming majority ownership. If I
> own 25% and Chuck has 4% of the stock, it sounds like he is definitely
> trying to give you the short end of the stick. When I invested in 1994,
my
> understanding was Harry 35% and Jeremy 40%. EVentually, Jeremy sold 4% of
> his stock to Chuck, but I was not privvy to the details. Harry, this
means
> Jeremy is trying to stick you with 20% ownership (if he claims 51%, I have
> 25% and Chuck has 4%.) Guys, we really need to stick together to get
> control of this whole thing away from Jeremy.
>
> This brings me to the last point. Right now I am the only Plaintiff on
the
> lawsuit. If you guys are interested in being added, please do so. It
> would be in your best interest to have a court of law uphold your
> percentages (and thereby your proceeds.) Harry, I suggest you claim 35%
in
> the suit when you join and Chuck claim your 4%

1

DEFENDANT'S
EXHIBIT
#3 Fort
2/21/0)

```
>
> I have one request of you guys, though.  Even though I am seeking
> compensation from Jeremy for legal expenses, there is always a possibility
> that I may not get them from Jeremy after the sale.  If we prevail and
> eventually receive fair compensation from the sale of america.com, I would
> request that we share the legal expenses I'm incurring to bring this suit
> (in proportion to our ownership percentage.)  Again, this is only if the
> judge will not require Jeremy to bear the expenses.  I think it's only
fair
> and it will only happen if we get the proceeds from the sale.  So far I've
> put in about $17,000 and I owe Mr. Rayson another $15,000 in the next week
> or two.  If it gets dragged out, I will end up mortgaging everything and
> will be in debt to my ears.  Please promise to help me out when the dust
> settles (in our favor.)
>
> If you are interested in joining as PLaintiffs, get in touch with Mr.
> Rayson's office as soon as possible. Mr. Rayson's associate, Tom Moss, is
> handling most of the case.  When you call, speak to him and explain who
you
> are.
>
> Law Offices of Rayson & Moss
> 2400 E. Oakland Park Blvd.
> Ft. Lauderdale, FL 33306
>
> 954-566-8855
> FAX 954-566-8902
> Rayson2000@aol.com
>
>
```

2

4831 NW 31ˢᵗ Avenue, #126
Fon_auderdale, Florida 33309-3433

16 December 1999

Harris, Beach and Wilcox
530 Fifth Avenue
New York, New York 10036

Re: Transfer of America.com domain

Dear Sir:

It has recently come to my attention that your organization is involved with the transfer, sale, and/or auction of the "America.com" domain name  On or about 19 November 1999, the domain registration was transferred (illegally) to America dot COM, Inc. of the Jipfa Building, 3ʳᵈ Floor, Road Town, Tortola, VG  Previously the registered owner was PSS Internet Services, Inc. of Daytona Beach, Florida.

As a member of the board of directors and a large shareholder of PSS Internet Services, I wish to inform you that the transfer of this asset was done without consent of the board of directors.  The transfer of the domain name to an unknown entity offshore has the appearance of fraud.  The assets of PSS Internet Services, Inc. (including, but not limited to "America.com," Earth.net," and "Worldwide.net") are the property of the shareholders and the disposal of those assets is a matter for the board of directors of that corporation.

While Mr. Jeremy Greenidge, currently of Barbados, was the president of the board of directors of PSS Internet Services, he was not authorized at any time to dispose of or transfer any assets of the corporation.  He is a minority shareholder (one of only four shareholders of the corporation) and had been acting as managing director.  His unilateral abrogation of his responsibility to protect the shareholders interests will not be tolerated.  I will not stand idly by while my investment in PSS Internet Services is made worthless through theft of its most valuable assets aided and abetted by Harris, Beach and Wilcox.

I strongly suggest that you investigate the fraudulent transfer and avoid any dealings in any subsequent transfer until the shareholders of PSS Internet Services, Inc. are protected.  I will use any legal means at my disposal to protect my interests, as well as those of my fellow shareholders, including filing suit for damages for any entity (including Harris, Beach and Wilcox) which is a party to this theft.

Sincerely,

George T. Kuhn
Director, PSS Internet Services, Inc.

HARRIS BEACH ...

DEC 21 1999

RECEIVED



DEFENDANT'S
EXHIBIT

JAN-12-00 WED 03:37 PM CRIC
DEC-23-1999 11:53 FROM:GREATDOMAINS.COM      818-753-6814        TO:246 9459444    P.
-06172-WJZ   Document 38     Entered on FLSD Docket 03/09/2001    Page

N - 

4631 NW 31ˢᵗ Avenue, #126
Fort Lauderdale, Florida 33309-3433

16 December 1999

GreatDomains.com
10 Universal City Plaza
Suite 1115
Universal City, California 91608

Re: Transfer of America.com domain

Dear Sir:

It has recently come to my attention that your organization is involved with the transfer, sale, and/or auction of the "America.com" domain name. On or about 19 November 1999, the domain registration was transferred (illegally) to America.dot.CON, Inc. of the Jipfa Building, 3ʳᵈ Floor, Road Town, Tortola, VG. Previously the registered owner was PSS Internet Services, Inc. of Daytona Beach, Florida.

As a member of the board of directors and a large shareholder of PSS Internet Services, I wish to inform you that the transfer of this asset was done without consent of the board of directors. The transfer of the domain name to an unknown entity offshore has the appearance of fraud. The assets of PSS Internet Services, Inc. (including, but not limited to "America.com," Earth.net," and "Worldwide.net") are the property of the shareholders and the disposal of those assets is a matter for the board of directors of that corporation.

While Mr. Jeremy Greenidge, currently of Barbados, was the president of the board of directors of PSS Internet Services, he was not authorized at any time to dispose of or transfer any assets of the corporation. He is a minority shareholder (one of only four shareholders of the corporation) and had been acting as managing director. His unilateral abrogation of his responsibility to protect the shareholders interests will not be tolerated. I will not stand idly by while my investment in PSS Internet Services is made worthless through theft of its most valuable assets aided and abetted by GreatDomains.com.

I strongly suggest that you investigate the fraudulent transfer and avoid any dealings in any subsequent transfer until the shareholders, the lawful owners, of PSS Internet Services, Inc. are protected. I will use any legal means at my disposal to protect my interests, as well as those of my fellow shareholders, including filing suit for damages for any entity (including GreatDomains.com) which is a party to this theft.

Sincerely,

George V. Kuhn
Director, PSS Internet Services, Inc.

# PSS INTERNET SERVICES, INC.

## 168 NORTH BEACH STREET · DAYTONA BEACH, FLORIDA 32144

9 February 2000

Network Solutions, Inc.
505 Huntmar Park Dr.
Herndon, Virginia 20170
ATTEN: Charles Mgugi

RE: Transfer of America.com domain

Dear Mr. Mgugi,

It has recently come to my attention that your organization is involved with the transfer of "America.com". On or about 19 November 1999, your organization registered this name to America dot COM, Inc. of the Jipfa Building. 3rd Floor, Road Town, VG. Previously the registered owner was PSS Internet Services, Inc. of Daytona Beach, Florida.

As a member of the board of directors and a large shareholder of PSS Internet Services, I wish to inform you that the transfer of this asset was done without consent of the board of directors. The transfer of the domain name to an unknown entity offshore has the appearance of fraud. The assets of PSS Internet Services, Inc. (including, but not limited to "America.com", "Earth.net", and "Worldwide.net") are the property of the shareholders and the disposal of these assets is a matter for the board of directors of that corporation.

While Mr. Jeremy Greenidge, currently of Barbados, was the president of the board of directors of PSS Internet Services, he was not authorized at any time to dispose of or transfer any assets of the corporation. He is a minority shareholder (one of only four shareholders of the corporation) and acted as managing director. His unilateral abrogation of his responsibility to protect the shareholders interests will not be tolerated. I will not stand idly by while my investment in PSS Internet Services is made worthless through theft of its most valuable assets aided and abetted by Network Solutions.

I strongly suggest that you rescind the fraudulent transfer until the shareholders of PSS Internet Services, Inc. are protected. I am using all legal means at my disposal to protect my interests, as well as those of my fellow shareholders, including filing suit for damages for any entity (including Network Solutions) which is a party to this theft.

Sincerely,

George T. Kuhn
Director, PSS Internet Services, Inc.



**APPLICATION FOR REINSTATEMENT**

FLORIDA DEPARTMENT OF STATE
Katherine Harris
Secretary of State
DIVISION OF CORPORATIONS

FILED
SECRETARY OF STATE
DIVISION OF CORPORATIONS

00 MAR -6 AM 8:10

**DOCUMENT #** P94000028046

1. Corporation Name

PSS INTERNET SERVICES, INC.

| Principal Place of Business | Mailing Address |
|---|---|
| 105 Lake Emerald Dr. # 804 Oakland Park, FL 33309 | same |

**REINSTATEMENT 98-00**

If above addresses are incorrect in any way, line through incorrect information and enter correction below.

| 2. New Principal Office Address, If Applicable | 3. New Mailing Office Address, If Applicable | 4. Date Incorporated or Qualified To Do Business In Florida 4/13/94 | |
|---|---|---|---|
| Suite, Apt. #, etc. | Suite, Apt. #, etc. | 5. FEI Number 59-3292321 | Applied For |
| City & State | City & State | | Not Applicable |
| Zip Country | Zip Country | 6. CERTIFICATE OF STATUS DESIRED ☑ | $8.75 Additional Fee required for a Certificate of Status |

7. Names and Street Addresses of Each Officer and/or Director (Florida nonprofit corporations must list at least 3 directors)

| Title(s) 1 | Name of Officers and/or Directors 2 | Street Address of Each Officer and/or Director 3 (Do NOT Use Post Office Box Numbers) | City / State / Zip 4 |
|---|---|---|---|
| D | George Kuhn | 105 Lake Emerald Dr. #804 | Oakland Park, FL 33309 |
| D | Harry Millan | 100 Kings Point Dr. #1805 | Sunny Isles Beach, FL 33160 |
| D | Charles Henderson | 6254 Hwy. 150 East | Denver, NC 28037 |

600003164646==C-
-03/10/00--01007--009
****1058.75 ****1058.75

| 8. Name and Address of Current Registered Agent | 9. Name and Address of New Registered Agent |
|---|---|
| Harry Millan 100 Kings Point Dr. #1805 Sunny Isles Beach, FL 33160 | Name David Matheny Street Address (P.O. Box Number is Not Acceptable) 105 Lake Emerald Dr., #804 Suite, Apt. #, Etc. #804 City Oakland Park State FL Zip Code 33309 |

10. I, being appointed the registered agent of the above named corporation, am familiar with and accept the obligations of Section 607.0505, F.S.

Signature of Registered Agent _____ (REGISTERED AGENT MUST SIGN)   Date 2-29-00

11. This corporation owes the current year Intangible Personal Property Tax due June 30.;   Yes ☐   No ☑   (See other side for information on intangible tax.)

12. I certify that I am an officer or director or the receiver or trustee empowered to execute this application as provided for in chapter 607 or 617, F.S. I further certify that when filing this reinstatement application, the reason for dissolution has been eliminated, the corporate name satisfies the requirements of section 607.0401 or 617.0401, F.S., that all fees owed by the corporation have been paid and the names of individuals listed on this form do not qualify for an exemption under section 119.07(3)(i), F.S. The information indicated on this application is true and accurate, and my signature shall have the same legal effect as if made under oath.

SIGNATURE: _____ GEORGE T. KUHN DIRECTOR 2-25-00   954-816-9595
SIGNATURE AND TYPED OR PRINTED NAME OF SIGNING OFFICER OR DIRECTOR   Date   Daytime Phone #

DEFENDANT'S EXHIBIT